# Exhibit C

IN THE SUPERIOR COURT OF PENNSYLVANIA
PHILADELPHIA DISTRICT

NO. 3675                                                    EDA 2009

COMMONWEALTH OF PENNSYLVANIA

v.

WILLIAM R. JOHNSON
**Appellant**

BRIEF FOR APPELLANT

APPEAL FROM THE FINAL JUDGMENT OF SENTENCE OF AUGUST 6, 2009,
COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY,
at No. 51-CR-1202271-2005

David Rudovsky
Attorney I.D. No. 15168
Kairys Rudovsky Messing
   & Feinberg, LLP
718 Arch Street, Suite 501S
Philadelphia, PA 19106
(215) 925-4400

Counsel for Appellant

Appeals
MAY 18 2010
District Attorney Office

IN THE SUPERIOR COURT OF PENNSYLVANIA
PHILADELPHIA DISTRICT

NO. 3675                                    EDA 2009

COMMONWEALTH OF PENNSYLVANIA

v.

WILLIAM R. JOHNSON
Appellant

BRIEF FOR APPELLANT

APPEAL FROM THE FINAL JUDGMENT OF SENTENCE OF AUGUST 6, 2009,
COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY,
at No. 51-CR-1202271-2005

David Rudovsky
Attorney I.D. No. 15168
Kairys Rudovsky Messing
  & Feinberg, LLP
718 Arch Street, Suite 501S
Philadelphia, PA 19106
(215) 925-4400

Counsel for Appellant

# TABLE OF CONTENTS

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SCOPE AND STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ORDER IN QUESTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

§1925(b) STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF THE QUESTIONS INVOLVED . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

EXHIBIT "A" - RULE 1925(b) STATEMENT

EXHIBIT "B" - TRIAL COURT OPINION

# TABLE OF CITATIONS

Arizona v. Fulminante, 499 U.S. 279, 296 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Bobadilla v. Carlson, 575 F.3d 785 (8th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Bruton v. United States, 391 U.S. 123, 135 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 26

Commonwealth v. Bazemore, 614 A.2d 684, 687-88 (Pa. 1992) . . . . . . . . . . . . . . . . . . . . 20

Commonwealth v. Collins, 702 A.2d 540, 544 (Pa. 1997) . . . . . . . . . . . . . . . . . . . . . . . 27

Commonwealth v. Duval, 307 A.2d 229 (Pa. 1973) . . . . . . . . . . . . . . . . . . . . 16, 20, 22

Commonwealth v. Green, 611 A.2d 1294 (Pa.Super. 1992) . . . . . . . . . . . . . . . . . . . . . . . 26

Commonwealth v. King, 689 A.2d 918, 923 (Pa. Super 1997) . . . . . . . . . . . . . . . . . . . . 27

Commonwealth v. Laich, 777 A.2d 1057 (Pa. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Commonwealth v. Laird, 988 A.2d 618, 629-30 (Pa. 2010) . . . . . . . . . . . . . . . . . . . . . . . 16

Commonwealth v. Markman, 916 A.2d 586, 603 (Pa. 2007) . . . . . . . . . . . . . . . . . . . . . . . 22

Commonwealth v. Overby, 809 A.2d 295 (Pa. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Commonwealth v. Rogers, 372 A.2d 771, 780 (Pa. 1977) . . . . . . . . . . . . . . . . . . . . . . . 16

Commonwealth v. Romero, 772 A.2d 1014 (Pa. 1999) . . . . . . . . . . . . . . . . . . . 19, 20, 25, 26

Commonwealth v. Sims, 521 A.2d 391, 396 (Pa. 1987) . . . . . . . . . . . . . . . . . . . 13, 16, 18, 21

Commonwealth v. Virtu, 432 A.2d 198 (Pa. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . 16, 22

Commonwealth v. Washington, 692 A.2d 1018 (Pa. 1997) . . . . . . . . . . . . . . . . . . . . . . . 26

Commonwealth v. White, 290 A.2d 246, 250-251 (Pa. 1972) . . . . . . . . . . . . . . . . . . . . . 27

Commonwealth v. Wright, 321 A.2d 625 (Pa. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Commonwealth v. Wright, 961 A.2d 119, 143 (Pa. 2008) . . . . . . . . . . . . . . . . . . . . . 20, 23

Crawford v. Washington, 541 U.S. 36 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Commonwealth v. Young, 748 A.2d 166, 193 (Pa. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Cruz v. New York, 481 U.S. 186 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Douglas v. Alabama, 380 U.S. 415 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 26

Jensen v. Romanowski, 590 F.3d 373 (6th Cir. 2009)(same) . . . . . . . . . . . . . . . . . . . . . . . . 26

Lilly v. Virginia, 527 U.S. 116 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Namet v. United States, 373 U.S. 179 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Ottomano v. United States, 468 F.2d 269, 273-74 (1st Cir. 1972) . . . . . . . . . . . . . . . . . . . . . 16

Ray v. Boatwright, 592 F.3d 793 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

United States v. Cabrera-Rivera, 583 F.3d 26, 36-37 (1st Cir. 2009) . . . . . . . . . . . . . . . . . . . 26

United States v. Grinage, 393 F.3d 746 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

United States v. Weiner, 2009 U.S. Dist. LEXIS 56932 (E.D. Pa. July 2, 2009) . . . . . . . . . . . 20

# STATEMENT OF JURISDICTION

This Court's jurisdiction to hear and decide this appeal from a final judgment of sentence is based on 42 Pa.C.S.A. §742 and Pa.R.App.P. 341(a).

# SCOPE AND STANDARD OF REVIEW

1.     On the issue of whether the appellant was denied his rights to confrontation and to a fair trial by the introduction of hearsay accusations by the non-testifying co-defendant and whether that error was prejudiced, the standard of review is plenary. <u>Commonwealth v. Overby</u>, 809 A.2d 295 (Pa. 2002).

2.     On the issue of whether the trial court erred in permitting evidence that permitted the jury to draw the false inference that appellant had threatened a Commonwealth witness, the standard of review is whether the court abused its discretion. <u>Commonwealth v. Laich</u>, 777 A.2d 1057 (Pa. 2001).

## ORDER IN QUESTION

Appellant appeals from the final judgment of sentence imposed by the trial court on August 6, 2009, in which he was sentenced to a term of 30-60 years incarceration.

## §1925(b) STATEMENT

Appellant's §1925(b) Statement of Matters complained of on Appeal is set forth at Exhibit "A" to the Brief.

# STATEMENT OF THE QUESTIONS INVOLVED

1.   Whether Appellant's Right to a Fair Trial, to Confrontation of Witnesses, and to the Exclusion of Hearsay Evidence Were Violated by the Co-defendant's Assertion of the Fifth Amendment Before the Jury and by the Introduction into Evidence of the Co-Defendant's Hearsay Accusations.

2.   Whether The Trial Court Erred in Permitting the Commonwealth to Present Evidence that Directly and Improperly Implied that Appellant had Threatened a Commonwealth Witness.

**A. Introduction**

This is a direct appeal from a judgment of sentence for convictions of third degree murder, criminal conspiracy, and possession of instruments of crime. In a 1925(b) Opinion, the trial court ruled that appellant's constitutional rights to confrontation were violated at trial by the admission of the hearsay statements of his co-defendant. The trial court seeks to sustain the conviction, however, on the ground that this error was "harmless." As shown below, this ruling ignores every significant factor on the issue of prejudice, including the fact that the improperly admitted evidence was central to the Commonwealth's case and that in a previous trial where this evidence was not introduced against appellant, there was a hung jury. The trial court also failed to recognize the separate and additional prejudice caused by the Commonwealth's misconduct in calling the co-defendant who had made clear that he would not testify and would invoke his Fifth Amendment rights. The statements of the convicted co-defendant directly implicating appellant caused severe prejudice, and the remaining evidence that implicated appellant and (which had failed to convince a jury in the previous trial) was thoroughly impeached.

**B. Procedural History**

Appellant, William Johnson, and his co-defendant Mumin Slaughter were arrested and charged with the August 26, 2005 murder of Terrence Flomo, an off-duty police officer who was in the area of Cecil B. Moore Avenue and 20th Street in North Philadelphia at 2 a.m., attempting to pick up a prostitute. The prosecution's theory at trial was that Brenda Bowens, a prostitute who was approached by Mr. Flomo, told the defendants of this event. Thereafter, according to the Commonwealth, the defendants shot and killed Mr. Flomo as he sat in his car.

6

At the first trial in 2007, the Commonwealth relied primarily on the testimony of Brenda Bowens and another prostitute, Nora Williams, who were on the streets at the time of the killing. While both testified that they saw the defendants at the car at the time of the shooting, they were impeached by their prior inconsistent statements, physical evidence, and their long term drug addition and criminal records. There was no other evidence that linked appellant to the crime.[1]

The jury acquitted both defendants of first degree murder. The co-defendant, Slaughter, was convicted of third degree murder, but a mistrial was declared as to the third degree murder charges against appellant due to a hung jury.

At the retrial of appellant on third degree murder, the Commonwealth's case was largely a duplicate of the first trial, with one major exception: the hearsay evidence of the co-defendant's statements given to police after his sentencing on third degree murder, that directly implicated appellant in the shooting. As noted, the trial court agreed in its post-sentence opinion that the admission of this evidence was in violation of appellant's confrontation rights. The jury found appellant guilty of third degree murder and the related charges.

Appellant was sentenced to a term of imprisonment of 30-60 years. He timely filed a notice of appeal and timely filed a 1925(b) statement.

## C. Factual History

At trial, the Commonwealth presented background evidence as to the killing of Mr. Flomo, including testimony as to the location of his car, forensic evidence as to the cause of death and bullet locations, initial descriptions of the perpetrators, and certain physical evidence

---

[1]The certified record from the Court of Common Pleas includes the transcript from the 2007 trial.

recovered by the police. None of this testimony linked appellant (or his co-defendant) to the shooting. The Commonwealth then presented the testimony of two eyewitnesses, Brenda Bowens and Nora Williams. Ms. Bowens testified that she was working as a prostitute that night. N.T. May 28, 202-203. She had finished with a customer and was walking to a house where she intended to get high, when Mr. Flomo called to her from his car. N.T. May 28, 204-206. She rejected his solicitation and then told the defendants that the victim had tried to pick her up. N.T. May 28, 207. Soon thereafter, she saw the defendants at Flomo's car, with the appellant at the passenger side, and heard gun shots. N.T. May 28, 208-210.

There was significant impeachment of this testimony. First, on two occasions, Ms. Bowens denied to detectives knowing anything about the shooting. N.T. May 28, 217-219; 238. She attempted to explain this conduct by asserting that she felt threatened in the neighborhood, though the prosecutor assured the court that the appellant was not connected to any such threats. N.T. May 28, 218-220. Second, Ms. Bowens was a long time cocaine addict with a "severe drug habit," who was using crack cocaine "almost every day," N.T. May 28, 231, and that night was anxious to get high after turning a trick in the neighborhood. N.T. May 28, 202-203. She admitted that the use of drugs and alcohol would cause her on some occassions "to have some distortions in . . . observations." N.T. May 28, 236. She also had prior convictions that were introduced to impeach her credibility, and she was on probation at the time of her statement with a bench warrant that had issued for her arrest. N.T. May 28, 237-238.

Third, and of particular relevance, during the prosecutor's re-direct examination, Ms. Bowens who had already testified that she only had a glancing, mini-second view of the crime from a considerable distance, stated that she could not be sure that it was appellant who was at

the car at the time of the shooting. N.T. 5/29 22-23; 45 Her testimony was also contradicted by forensics evidence (as to proximity of shooter to the victim) and weakened by the factors of time, place and observation of the event. N.T. May 28, 263; May 29, 16-18; June 2, 161, 209 (arguments whether she was 600 or 300 feet away).

Nora Williams also testified that she was a prostitute and drug addict and that she was high that night. N.T. May 29, 51-52; 97. Ms. Williams used 50 bags of cocaine a day. N.T. May 29, 102. She observed the defendants run to the victim's car and start shooting, but could see this only by a "glance" and in a "mini-second." N.T. May 29, 113. After the incident she was questioned by detectives and first stated that she knew nothing about the shooting. N.T. May 29, 66. Further, she had open charges and a bench warrant at the time of the incident and her questioning by detectives. May 29, 98; 104-105.

The Commonwealth presented testimony from David Kelley and Anthony Bennett who stated that they saw the <u>co-defendant Slaughter</u> on the street that night (Bennett saw him just around the time of the shooting with a "bulge" in his pocket; he had also seen the co-defendant previously with a gun). But neither witness had seen appellant in the neighborhood that night. The defense presented stipulated testimony from Debra Bryant who testified that she saw the shooting and that neither appellant nor the co-defendant were the perpetrators. N.T. June 2, 95.

Following the first trial, the co-defendant Slaughter was sentenced on his third degree murder conviction. At some point before the second trial, there were discussions between Slaughter's lawyer and the prosecution and it was agreed that the sentence in his case would be vacated if he gave a statement concerning appellant's alleged involvement in the shooting. Slaughter gave a statement implicating appellant and his sentence was vacated pending the new

trial for appellant. R.R. 41-44.

At trial, however, the prosecutor informed the court that Slaughter was refusing to come to court to testify. R.R. 22. The trial court, without consulting counsel for Slaughter, erroneously stated that he would not have a Fifth Amendment claim. R.R. 22. At this point the defense argued that any inquiries as to Slaughter's willingness to testify be outside the presence of the jury. R.R. 22-23; 25. The court denied the request and permitted the jury to hear Slaughter's refusal to testify. R.R. 25-26. After background questions (regarding his current location in prison and his conviction at his trial), Slaughter refused to testify as to any matter of substance and asserted his Fifth Amendment rights. R.R. 27-29. The prosecutor, over defense objection, R.R. 30, then showed Slaughter the statement he had allegedly given to a detective, but he still refused to testify, including a refusal to say if he had signed that statement. R.R. 30-33.

At this point, the court summoned Slaughter's lawyer who reported to the court that his client claimed that the statement was given to the detective only to encourage appellant to take a negotiated plea, that his accusations against appellant were false, and that he would not testify. R.R. 41-44. Thus, all parties were again on notice that Slaughter would refuse to answer any questions regarding the incident. Nevertheless, the court permitted the prosecutor to re-call Slaughter, who once again refused to testify as to anything of substance regarding appellant or the incident in question. R.R. 48-53. The court then agreed to the prosecutor's request to suspend the trial proceedings and to move to a sentencing hearing for Slaughter.

At the sentencing hearing (*at which appellant was not represented and could not question Slaughter*), Slaughter refused to answer any questions as to the substance of the statement he

allegedly gave to the detective; all he would say is that he signed the statement. R.R. 119-126. As the court prepared to go back to the trial of appellant, Slaughter again stated that he would not testify (indeed, that he was unwilling even to take the stand) and his lawyer informed the court that if again called as a witness, he would refuse to testify. R.R 125-129. At this juncture, counsel for appellant moved for a mistrial, R.R. 130-131, and again asserted error in having Slaughter called to the stand when the court and prosecutor knew he would not testify. R.R. 130-132. Defense counsel also argued that he had no way to cross-examine Slaughter and that use of his hearsay statements at sentencing or to the detective would deny appellant of his rights to confrontation. R.R. 130-133.

Appellant's trial then resumed. With the jury present Slaughter was asked by the prosecutor whether he gave a statement to a detective, whether he sold drugs, and other questions about the incident, but he refused to respond; indeed, Slaughter was explicit in saying that he would not answer questions "from him [the prosecutor], his defense, or you [the court]." R.R. 73. Over objection and a motion for a mistrial, R.R. 73, the prosecutor was then permitted to show Slaughter's alleged statement to the detective by way of a large screen in the courtroom. R.R. 74-75. When the prosecutor questioned Slaughter about the statement, Slaughter, now agitated and cursing, refused to respond. R.R. 75-77. At this point, the prosecutor started to question Slaughter about his testimony at sentencing (in which Slaughter had talked about putting together a "freaking statement" to help himself and how he was being railroaded). R.R. 75-82. Finally, the jury was excused and Slaughter was asked whether he would answer questions from the defense attorney. Slaughter made clear that he would not and asked the court to "just send me out of here." R.R. 85-86. Defense counsel asked several questions which

Slaughter refused to answer, including questions as to whether Slaughter knew the appellant or anything about the case. R.R. 89-91.

Slaughter also refused to answer questions from the court. R.R. 90-91. On redirect examination, when the prosecutor showed Slaughter the transcript from his sentencing hearing, he refused to answer any questions. At this point, on the ground that Slaughter (but not the appellant) was trying to "subvert justice," R.R. 95, the court permitted the Commonwealth to call the detective who allegedly took the statement from Slaughter to testify as to its contents, R.R. 101-107, and further permitted the Commonwealth to introduce into evidence the transcript of the sentencing hearing in which the hearing statement against appellant was part of the record. N.T. June 2, 77.

## SUMMARY OF ARGUMENT

The Commonwealth called the co-defendant to the witness stand in front of the jury,

knowing that he had invoked his Fifth Amendment right against self-incrimination and would

refuse to testify. Thereafter, the court admitted into evidence the co-defendant's testimonial

accusations against appellant, directly implicating him in the shooting of the victim. These

actions violated appellant's rights to a fair trial and to his right to confrontation of prosecution

witnesses.

The co-defendant (and his counsel) made it clear to the Commonwealth and to the trial

court, that he would invoke his Fifth Amendment right against self-incrimination and would

otherwise refuse to testify at this trial. Notwithstanding the co-defendant's persistent refusal to

testify, even in the face of threatened contempt and re-sentencing on his own conviction, the

Commonwealth insisted on having him refuse to testify in front of the jury, thus causing what the

Supreme Court of Pennsylvania has termed the "innuendo of guilt by association."

Commonwealth v. Sims, 521 A.2d 391, 396 (Pa. 1987).

Separately, as the trial court has acknowledged, the introduction into evidence of the prior

statements of the co-defendant, both to the detective and at his re-sentencing, was in clear

violation of the Confrontation Clauses of the United States and Pennsylvania Constitutions, and

settled hearsay evidence principles. These statements to law enforcement officers were

testimonial in nature and therefore inadmissible where appellant had no opportunity to cross-

examine the co-defendant.

The constitutional and evidentiary errors were severely prejudicial and the

Commonwealth cannot show that the errors were harmless beyond a reasonable doubt. The use

of a co-defendant's accusatory statement is so prejudicial that the United States and Pennsylvania Supreme Courts have held that limiting instructions on their use by the jury are insufficient as a matter of law. In this case, the statements of the co-defendant were a centerpiece of the Commonwealth's case. Indeed, at the first trial, where the evidence against appellant was virtually identical, *except for the co-defendant's statements*, the jury could not reach a decision and a mistrial trial was declared. The only other evidence against appellant was the highly questionable and thoroughly impeached testimony of two prostitutes and long term drug addicts. These witnesses identified appellant under circumstances that were inherently implausible and their suspect testimony was not sufficient to convict at the first trial. There was contrary eyewitness testimony (that appellant was not present) and no other forensic or corroborating evidence of guilt.

The trial court also erred and caused substantial prejudice to appellant in permitting the Commonwealth to present evidence that directly, but without any factual basis, implied that he had threatened the lead Commonwealth witness. This was done through testimony of supposed "death threats" and by the assertion that the preliminary hearing was recorded so as to "preserve" her testimony in case she died before trial. The Commonwealth conceded that it had no evidence to link appellant to any threat and, therefore, this evidence was highly improper and prejudicial.

**ARGUMENT**

I.     **Appellant's Right to a Fair Trial, to Confrontation of Witnesses and to the Exclusion of Hearsay Evidence Were Violated by the Co-defendant's Assertion of the Fifth Amendment Before the Jury and by the Introduction into Evidence of the Co-Defendant's Hearsay Accusations**

The circumstances under which the trial court permitted the Commonwealth to present to the jury the hearsay statements of the co-defendant Slaughter establish several related violations of appellant's right to confrontation of witnesses, to the exclusion of hearsay testimony, and to a fair trial. The trial court, in its 1925(b) Opinion, conceded that there was a constitutional error in the admission of hearsay statements, but the Opinion fails to acknowledge the scope and depth of the related violations that occurred with respect to the witness Slaughter. The errors committed by the trial court were so substantial, pervasive, and prejudicial as to mandate a new trial. In suggesting that the errors were harmless, the trial court neglected the overwhelming evidence of prejudice.

A. The Constitutional and Evidentiary Violations

The trial court committed a series of serious constitutional and evidentiary errors in its rulings on the admissibility of hearsay statements of the co-defendant. First, the court erred in permitting the Commonwealth to call the co-defendant when the prosecutor knew that he would assert a privilege not to testify and would refuse to answer any questions of substance. Second, the court erred in admitting the hearsay statements of the co-defendant under the Pennsylvania Rules of Evidence. Third, the admission of these hearsay statements caused a constitutional violation of appellant's right to confrontation of witnesses under the United States and Pennsylvania Constitutions.

15

1. The Calling of the Co-defendant Who had Stated His Intent to Assert Fifth
Amendment Rights or Otherwise Refuse to Testify Deprived Appellant of a Fair Trial

It is well settled that a prosecutor may not call to the stand a witness whom the prosecutor

knows or has reason to know will invoke his Fifth Amendment rights, as this will inevitably lead

the jury to assume wrongdoing by the defendant by "the innuendo of guilt by association."

Commonwealth v. Sims, 521 A.2d 391, 396 (Pa. 1987). See also, Commonwealth v. Virtu, 432

A.2d 198 (Pa. 1981); Commonwealth v. Wright, 321 A.2d 625 (Pa. 1974)(citing previous cases

where Court "held that it is reversible error for the prosecution, once informed of a witness'

intention to claim a privilege against self-incrimination, to call that witness  .  .  .  where

the witness is likely to be thought by the jury to be associated with the defendant in the incident

.  .  ."). Of course, the prejudice is even greater where, as here, the witness asserting the Fifth

Amendment is a convicted co-defendant.[2]

There is overwhelming evidence that the prosecutor and the court knew that the co-

defendant would not testify and would claim a Fifth Amendment privilege. At the point where

the prosecutor intended to call Slaughter as a witness, he informed the court that Slaughter was

---

[2]When informed of Slaughter's stated refusal to testify, the court erroneously ruled that he
did not have a valid Fifth Amendment right to silence. The Supreme Court has recognized "that
a witness whose conviction has not been finalized on direct appeal [may] invoke the privilege of
self-incrimination and refuse to testify about the subject matter which formed the basis of his
conviction." Commonwealth v. Rogers, 372 A.2d 771, 780 (Pa. 1977). See also,
Commonwealth v. Laird, 988 A.2d 618, 629-30 (Pa. 2010)(trial court sustained Fifth
Amendment claim of co-defendant who had been previously convicted); Ottomano v. United
States, 468 F.2d 269, 273-74 (1st Cir. 1972)(witness who had a motion to vacate his sentence
pending in the district court could not be compelled to testify against his co-defendant).
Moreover, whether the claim of privilege is valid should be resolved outside the presence of the
jury, and even if the trial court overrules the assertion of the privilege, it is error to call the
witness who will still insist on refusing to testify. See Commonwealth v. Duval, 307 A.2d 229
(Pa. 1973).

refusing to come to court to testify. R.R. 22. Defense counsel requested the court to determine whether Slaughter would testify, but the court denied this request and improperly permitted the jury to hear his refusal to testify. R.R. 22-23; 25. True to his stated intent, Slaughter immediately refused to testify on Fifth Amendment grounds. R.R. 27-29. Over defense objection, the prosecutor stated that Slaughter had been convicted of murder and had moved to vacate his sentence and "cooperate" with the prosecution. R.R. 27. The prosecutor then showed Slaughter the statement he had allegedly given to a detective, but Slaughter still refused to testify. R.R. 27-32 .

At this juncture, Slaughter's counsel, William Cannon, Esquire, informed the court that his client had informed him that he would not testify. R.R. 41-44.[3] Accordingly, all parties were again on notice that Slaughter would refuse to answer any questions regarding appellant, and would assert his Fifth Amendment rights. Nevertheless, the court permitted the prosecutor to re-call Slaughter (again improperly rejecting his Fifth Amendment claim not to testify), but he refused to testify as to anything of substance regarding appellant or the incident in question. R.R. 38-53.

Finally, in yet another reprise of this highly prejudicial process, after Slaughter was sentenced and he and his counsel again stated that he would not testify, the trial court still ordered Slaughter to the witness stand to repeat before the jury his refusal to answer any questions about the incident. R.R. 119-126; 125-129. Moreover, the resulting exchange between the prosecutor and the witness was even more damaging and prejudicial to appellant. Slaughter

---

[3]The trial court did not provide a reason why it waited until this point in the proceedings to summon Mr. Cannon.

was asked by the prosecutor whether he gave a statement to a detective, whether he sold drugs, and other questions about the incident, but he refused to respond. The prosecutor then showed on a large screen Slaughter's alleged statement to the detective. R.R. 74-75. When the prosecutor questioned Slaughter about the statement, Slaughter, now agitated and cursing, refused to respond. R.R. 75-82. At this point, the prosecutor questioned Slaughter about his testimony at sentencing, a proceeding at which Slaughter had talked about putting together a "freaking statement" to help himself. R.R. 79.

The serious concern expressed by the Supreme Court of Pennsylvania as to the prejudice that would result in calling a witness who will assert a privilege or otherwise refuse to testify was made doubly manifest in this case. Here, the jury knew that Slaughter was the co-defendant of the appellant (and, therefore, was being called to the stand by the prosecutor to implicate him in the crime) and that Slaughter had already been convicted. His refusal to testify could only be taken by the jury as an attempt by a convicted murderer to shield his co-defendant, thereby directly proving guilt by association. See, Commonwealth v. Sims, 521 A.2d at 396. And, to drive this point home, the prosecutor, with the clear intent of showing the jury what he wanted the witness to say, exhibited to the jury and had other witnesses testify as to Slaughter's statements to a detective and Slaughter's acknowledgment of his signature on his statement (at his own sentencing) all of which directly implicated appellant in the shooting. Thus, independent of the hearsay and Confrontation Clause violations, the actions of the Commonwealth in repeatedly forcing the convicted co-defendant to the stand, where it was crystal clear that he would invoke his Fifth Amendment privilege and refuse to testify, constitutes reversible error.

18

2. The Admission of the Out-of-Court Statements of the Co-Defendant Violated Pennsylvania Hearsay Rules and the Confrontation Clauses of the United States and Pennsylvania Constitutions

As the trial court agreed in its Opinion, the introduction into evidence of the hearsay statements of the co-defendant Slaughter was in violation of the rules of evidence and contravened appellant's rights to confrontation of witnesses under the United States and Pennsylvania Constitutions.

The trial court permitted the Commonwealth to introduce two hearsay statements of the co-defendant that directly implicated appellant in the shooting: the statement allegedly given to a police detective after the first trial and statements made by Slaughter at his sentencing. In neither situation did appellant have the opportunity to cross-examine Slaughter and, given Slaughter's consistent refusal to answer any questions (by the prosecutor, defense counsel or the court) on the substance of these statements, the rule precluding hearsay testimony was plainly violated. See e.g., Lilly v. Virginia, 527 U.S. 116 (1999); Commonwealth v. Romero, 772 A.2d 1014 (Pa. 1999). Slaughter consistently and repeatedly refused to answer any questions regarding appellant's alleged involvement in this matter and, in the one instance where Slaughter acknowledged having made a prior statement about appellant (though directly contesting its accuracy as reported), appellant was not a party to the proceeding and had no right or opportunity to cross-examine Slaughter on the matter. Accordingly, the trial court's determination that "Slaughter's obstreperousness and refusal to answer any questions deprived [appellant] of his right to cross-examine him," Opinion at 6, was fully justified.[4]

_____

[4] The trial court determined that Slaughter was "subverting justice." R.R. 95. There was no evidence and the court did not find any involvement of appellant in Slaughter's refusal to testify.

Moreover, because the statements were "testimonial" in nature their admission into evidence also violated appellant's right to confrontation of witnesses. Crawford v. Washington, 541 U.S. 36 (2004); Douglas v. Alabama, 380 U.S. 415 (1965)(improper for prosecutor to read prior statement of witness under the guise of refreshing his recollection in the face of a Fifth Amendment claim to silence); Commonwealth v. Romero, 722 A.2d at 1018 (where witness "explicitly and repetitively" refused to answer questions about the defendant's involvement in the crime, even where he testified as to the actions of others, defendant denied opportunity for cross-examination); Commonwealth v. Bazemore, 614 A.2d 684, 687-88 (Pa. 1992); United States v. Grinage, 393 F.3d 746 (2d Cir. 2004)(plea allocution is testimonial); United States v. Weiner, 2009 U.S. Dist. LEXIS 56932 (E.D. Pa. July 2, 2009)(post arrest "proffer" statement is testimonial).[5]

### 3. The Admission of the Hearsay Statements and the Denial of Confrontation was Severely Predjudicial

The trial court's determination that the constitutional and evidentiary errors that led to the introduction of the co-defendants highly damaging statements were harmless is clear error. The trial court failed to consider a number of critical factors, all of which demonstrate the severely prejudicial impact of these statements, and failed as well to consider well settled law on the prejudice caused by the introduction of the hearsay statements of a co-defendant who has already been convicted of the crime in question.

---

[5]Appellant properly preserved the issue of the prejudice caused by Slaughter's assertion of the Fifth Amendment. R.R. 22-23; 25; 30; 130-133. The trial court did not attempt to secure the testimony through contempt proceedings. Moreover, regardless of the basis of the refusal to testify, confrontation rights are violated by the fact of the refusal to testify before the jury, valid or not. See, e.g., Commonwealth v. Romero, 722 A.2d at 1017-18; Commonwealth v. DuVal, 307 A.2d 229.

Initially, it is well established that a constitutional error at trial can be found harmless only if the court can find that the unconstitutional evidence "did not contribute" to the conviction. Arizona v. Fulminante, 499 U.S. 279, 296 (1991); Commonwealth v. Wright, 961 A.2d 119, 143 (Pa. 2008)("Commonwealth has the burden of proving harmless error beyond a reasonable doubt"). In this case, the nature of the violation, its pervasive impact on the jury, the Commonwealth's substantial reliance on the inadmissible evidence, and the weakness of the Commonwealth's case mandate a finding of no harmless error.

First, the trial court failed to recognize the depth and pervasiveness of the related constitutional and evidentiary violations: (1) that it permitted the prosecution to present a witness to the jury who the prosecution and court knew would assert a Fifth Amendment claim and otherwise refuse to testify in front of the jury, and (2) that the prosecution was permitted to introduce not only the statement made by Slaughter to the detective, but also his testimony at sentencing acknowledging that statement. The combined effect of these errors was overwhelming. They showed that a co-defendant already convicted of the crime had named appellant as the actual shooter and was refusing to cooperate with the Commonwealth in the prosecution and that he was using the Fifth Amendment to do so, thus directly suggesting that the jury assume wrongdoing by the appellant by "the innuendo of guilt by association." Commonwealth v. Sims, 521 A.2d at 396.

Courts have found reversible error in situations where only one of these violations occurred. Thus, where a prosecutor calls a witness with knowledge that he will refuse to testify and/or take the Fifth Amendment in front of the jury, there is sufficient prejudice for a new trial, even without the introduction of accusatory hearsay statements. See e.g., Namet v. United

21

States, 373 U.S. 179 (1963)(reversal required where prosecutor calls witness who is closely associated with the defendant and who will invoke a testimonial privilege or where the inferences that normally arise from a refusal to testify adds significant weight to the case); Commonwealth v. Markman, 916 A.2d 586, 603 (Pa. 2007)(where co-defendant's improperly admitted statement was irreconcilable with defendant's version of event, the error was prejudicial); Commonwealth v. Young, 748 A.2d 166, 193 (Pa. 1999)(admission of co-defendant's statement implicating defendant; "difficult to imagine any evidence more . . . prejudicial to a defendant"); Commonwealth v. Virtu, 432 A.2d 198; Commonwealth v. Duval, 307 A.2d 229.

The United States Supreme Court has cautioned that the use of a co-defendant's admission that contains accusations against a defendant is so prejudicial that even a cautionary instruction is insufficient to cleanse the prejudice. Bruton v. United States, 391 U.S. 123, 135 (1968)( "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored"). See also, Cruz v. New York, 481 U.S. 186 (1987)(describing the devastating impact of this type of testimony). Of course, in the Bruton line of cases, there is at least an instruction to the jury that the evidence is not admissible against the defendant; by sharp contrast, here, the evidence was introduced *directly* against appellant, with no limitations and no cautionary instructions.

Second, the Commonwealth spent significant trial time in eliciting the inadmissible evidence. R.R. 22-117. Over two days, and with a number of witnesses, the prosecution adroitly drew a picture of a convicted co-conspirator who had direct knowledge of appellant's "guilt" and who had given a formal statement to that effect to a detective, now refusing to cooperate with the

prosecution or the court, and hiding from the jury through a Fifth Amendment claim this critical evidence.[6]  Not surprisingly, the prosecutor focused on this evidence in his closing argument, stressing the fact that a convicted co-defendant and conspirator had both confessed to the crime, had directly implicated appellant, and now, like a "snake," was trying to protect appellant. N.T. June 2, 219, 228.  Significantly, for the prosecution, the co-defendant's statement was both strong independent evidence of guilt and was necessary given the serious impeachment of its street witnesses.

Third, there is no basis to conclude that this evidence was "merely cumulative" of other evidence or that the other evidence was "so overwhelming and the prejudicial effect of the error was so *insignficant* by comparison." Commonwealth v. Wright, 961 A.2d at 143 (emphasis added).  The only other evidence linking appellant to the shooting was the highly impeached and inconsistent testimony of two admitted prostitutes and long term drug addicts.  Both witnesses were interviewed by homicide detectives and each initially stated (Bowens on two occassions) that she did not know anything about the incident and did not name appellant or Slaughter as being involved.  N.T. May 28, 217-219; 238; May 29, 66.  Ms. Bowens was impeached by criminal convictions and her probation and bench warrant status at the time of the incident and her statements to detectives.  Further, her testimony was inconsistent with the ballistics evidence and was inherently implausible given the time and location of the event.  As the defense argued, she was 600 feet from the shooting (and even the prosecutor conceded that she placed herself no closer than 300 feet from the shooting), on a dark street.  N.T. June 2, 209, and she saw the

---

[6]While there was no evidence that appellant caused or encouraged the co-defendant not to testify, R.R. 94, the jury was not instructed to reject any such inference.

incident for only a mini-second. N.T. May 29, 22-23. And, of critical significance, Ms. Bowens (who was a fully cooperative Commonwealth witness) testified that given all of the circumstances, she could not be sure it was appellant who she saw at the victim's car. N.T. May 29, 22-23; 27-45. Indeed, Ms. Bowens stated that her cocaine use caused distortions to her observations on some occasions. N.T. May 28, 236.

Ms. Williams was subjected to similar impeachment. She had also told detectives that she had no knowledge of the incident and she was also the beneficiary of assistance from the Commonwealth. She was a long time prostitute and cocaine addict (with a 50 bag a day habit) with a criminal record, including being wanted on a bench warrant at the time of the incident. Her story, too, was inconsistent with the physical facts and location: as in the case of Ms. Bowens, Ms. Williams testified that she saw the shooting only at a glance and for a "mini-second." N.T. May 29, 113.

On the issue of who was at the location, the jury heard testimony from Debra Bryant that appellant was not at the car at the time of the shooting. No other evidence tied appellant to the crime and in particular the forensics and physical evidence was entirely inconclusive. Appellant turned himself into police as soon as he heard that he was a suspect in this case.

Surely, the statement of a convicted co-defendant directly asserting the guilt of the defendant, and introduced under circumstances in which the jury actually observed him obstreperously refusing to testify and asserting the Fifth Amendment, cannot be considered "merely cumulative" to thoroughly impeached eyewitness testimony. But in this case there is no need for speculation on this issue since the record conclusively demonstrates that the error was prejudicial. *At the first trial, where both Ms. Bowens and Ms. Williams testified against*

24

*appellant, and where the rest of the prosecution's case was basically the same as the second trial*

*- - except for the hearsay statements of the co-defendant - - the jury acquitted appellant of first*

*degree murder and could not reach a verdict on the other charges, including third degree*

*murder.* N.T. September 19, 20, 21, 24, 2007. At the second trial, where the only difference in the Commonwealth's case was the additional inadmissible evidence, the jury convicted appellant. There could not be a more telling "acid test" on the nature of the error. Without the inadmissible evidence, the Commonwealth failed to convict and the differing verdicts of two juries uniquely demonstrates the prejudicial nature of the error.[7]

By any measure, including the quality and quantity of the inadmissible evidence, the pervasive errors in the presentation of the co-defendant and his hearsay accusations against appellant were highly prejudicial and there is no basis for a finding that the Commonwealth has shown beyond a reasonable doubt that the error had no impact on the verdict. To avoid this conclusion, the trial court attempts to equate this case with Commonwealth v. Romero, 722 A.2d 1014, where a confrontation clause violation was found harmless. But the circumstances in Romero were diametrically opposed to those in this case. In Romero, not only was there admissible evidence from another co-defendant who testified as to the defendant's direct involvement in the crime (the confrontation clause violation involved a second accomplice), but there was evidence that the defendant had *confessed* to the crime in a manner that was highly corroborative of the prosecution's theory of the case. Further, there was reliable eyewitness testimony. Thus, the hearsay statement of one accomplice was not of consequence as it was

---

[7]Indeed, the Commonwealth's evidence at the second trial regarding the witness Bowens was even weaker than it was at the first trial. At the second trial, she testified that she could not be sure if the appellant was at the scene of the shooting. N.T. May 29, 22-23; 27; 45.

cumulative of the testimony of another accomplice and of the confession by the defendant. The cases could not be more dissimilar for purposes of harmless error analysis.[8]

In cases where the inadmissible hearsay evidence directly accusing the defendant of the crime was not the same as other properly admitted accomplice testimony, the courts have consistently found no harmless error. See, e.g., Douglas v. Alabama, 380 U.S. 415; Bruton v. United States, 391 U.S. 393; Ray v. Boatwright, 592 F.3d 793 (7th Cir. 2010)(prejudicial confrontation clause error, even where the defendant had burden of showing prejudice); Jensen v. Romanowski, 590 F.3d 373 (6th Cir. 2009)(same); United States v. Cabrera-Rivera, 583 F.3d 26, 36-37 (1st Cir. 2009)(confrontation clause error not harmless where the challenged testimony was relied upon by the prosecutor in closing argument and case was not overwhelming, notwithstanding eyewitness testimony); Bobadilla v. Carlson, 575 F.3d 785 (8th Cir. 2009)(confrontation clause violation not harmless notwithstanding independent evidence in the case of the defendant's sexual assault of the complainant). See also Commonwealth v. Green, 611 A.2d 1294 (Pa.Super. 1992).

Accordingly, whether viewed as independent constitutional and evidentiary violations, or for their cumulative prejudicial impact, the actions of the Commonwealth and the trial court's with respect to the appearance and hearsay statements of the the co-defendant mandate a new trial.[9]

---

[8]In Commonwealth v. Washington, 692 A.2d 1018 (Pa. 1997), cited in Romero, the same facts supported a finding of harmless error: a confession of the defendant that tracked the hearsay allegations against him, eyewitness testimony strongly corroborative of the confession, and ballistics evidence.

[9]The Court should also consider any prejudice caused by the improper evidence that falsely suggested that appellant threatened a witness. Infra, at 27-28.

## II. The Trial Court Erred in Permitting the Commonwealth to Present Evidence that Directly And Improperly Implied that Appellant had Threatened a Commonwealth Witness

In the presentation of the testimony of Brenda Bowens, the Commonwealth sought to bolster her credibility by providing reasons for her initial refusal to state that she knew anything about this incident to investigating detectives and to use her preliminary hearing testimony as proof of the truthfulness of her testimony. With respect to the inconsistent statements to the detectives, Ms. Bowens testified that she did not implicate appellant because of death threats from someone in the neighborhood. N.T. May 28, 218-220.[10] The trial court permitted this testimony on the assurance of the prosecutor that he would not tie these threats to appellant, id., but there could be no other inference drawn from the testimony provided by Ms. Bowens. Thus, while evidence as to why a witness has given an inconsistent statement is generally admissible, Commonwealth v. Collins, 702 A.2d 540, 544 (Pa. 1997), where that evidence erroneously implicates the defendant in criminal conduct, the evidence is so highly prejudicial as to deny him of a fair trial. See, e.g., Commonwealth v. White, 290 A.2d 246, 250-251 (Pa. 1972)(evidence of effort to interfere with juror, with no proof that defendant "embrace[d]" that effort, prejudicial and requires a new trial); Commonwealth v. King, 689 A.2d 918, 923 (Pa. Super 1997)(affirming pre-trial motion in limine excluding evidence of break in at home of witness absent of proof that defendant was involved).

This error was compounded by the Commonwealth examination of Ms. Bowens as to her

---

[10]The trial court discusses this issue in its Opinion, but suggests that it was "waived" for failure to specify the transcript page from the trial in the Rule 1925(b) statement. Appellant made specific allegations in his 1925(b) statement, both as to the witness involved and the precise nature of the testimony at issue. Exhibit A at 3-4.

testimony at the preliminary hearing. The prosecutor went far beyond using that testimony as a prior consistent statement when he separately elicited testimony from Ms. Bowens that the reason that the testimony was recorded was to "preserve" it in case the witness died before trial. N.T. May 29, at 28-29 (motion for mistrial). Plainly, this evidence was completely irrelevant unless appellant had threatened the witness (which the prosecutor concedes did not happen) and was manifestly prejudicial. Once again, the implication was clear: that appellant had made death threats to a key Commonwealth witness, when in fact that was untrue. The trial court states that the prejudice was minimal since the "threats were not traced to the defendant," but since the jury was not informed of this fact, and would inevitably draw the inference that the defendant (or someone acting on his behalf) had made death threats, the evidence was inadmissible and cause prejudicial error. Id.

## Conclusion

The trial court's determination that appellant was denied his rights to confrontation should require a new trial. For all of the foregoing reasons, the judgment of sentence should be vacated and the case remanded for a new trial.

Respectfully submitted,

David Rudovsky
Attorney I.D. No. 15168
Kairys Rudovsky Messing & Feinberg, LLP
718 Arch Street, Suite 501S
Philadelphia, PA 19106
(215) 925-4400

Counsel for Appellant