IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM JOHNSON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MARIROSA LAMAS, et al | : | NO. 12-5156 |

**REPORT AND RECOMMENDATION**

ELIZABETH T. HEY, U.S.M.J. December 18, 2013

This is a counseled petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254, on behalf of William Johnson, who is currently incarcerated at the State Correctional Institution in Rockview, Pennsylvania. For the reasons that follow, I recommend that the petition be denied.

## I. FACTS AND PROCEDURAL HISTORY

In September 2007, Johnson and his co-defendant Mumin Slaughter proceeded to a jury trial before the Honorable Jeffrey P. Minehart of the Court of Common Pleas of Philadelphia County, on murder and related charges in connection with the shooting death of Terrance Flomo on August 26, 2005. The jury acquitted both defendants of first-degree murder and convicted Slaughter of charges including third-degree murder, and a mistrial was declared when the jury could not reach a verdict on other charges. Judge Minehart thereafter imposed sentence on Slaughter, but vacated the sentence when Slaughter gave a statement to police implicating Johnson in the murder. The events surrounding Slaughter's being called as a witness in Johnson's retrial form the basis for the primary issues raised in this matter.

On June 3, 2009, a second jury found Johnson guilty of third-degree murder and criminal conspiracy and acquitted him of possession of instruments of crime. N.T. 6/3/09 at 14-15. The Pennsylvania Superior Court summarized the trial evidence as follows:

> On August 26, 2005, shortly after 2:00 a.m., Philadelphia Police Officer Vincent LaBrice received a radio call directing him to go to 20th Street and Cecil B. Moore Avenue to investigate a report of a shooting. Upon arrival in that general area, the officer observed a car resting against a telephone pole located at 20th and Turner Streets. Inside the car, he saw a male slumped over the steering wheel. Further investigation revealed that the male had been shot and though still alive, he was unresponsive. Another officer soon arrived and assisted Officer LaBrice in removing the male from the car. Officer LaBrice then discovered that the male was an off-duty police officer who was later identified as Terrence Flomo. An ambulance arrived shortly thereafter and took Mr. Flomo to a nearby hospital where he was pronounced dead.
>
> An autopsy performed on Mr. Flomo's body revealed that he died as a result of having suffered three gunshot wounds that caused damage to his right arm, liver, lungs, and heart. The manner of death was homicide.
>
> Two individuals witnessed the shooting, Brenda Bowens and Nora Williams, two prostitutes who were working in the area that night. According to Ms. Bowens, Mr. Flomo drove up and called out to her. Ms. Bowens, who had just finished with a customer and was addicted to crack cocaine at the time, waved him off because she was on her way to a crack house to smoke crack she had just purchased with the money she just earned. Prior to going to the crack house, Ms. Bowens saw Johnson and Mr. Mumin Slaughter, both of whom she knew for some time and from whom she often purchased drugs, and told them that Mr. Flomo was trying to pick her up. Both men immediately began walking in the direction where Ms. Bowens had seen Mr. Flomo.
>
> When Ms. Bowens arrived at the crack house, she looked back at Mr. Flomo's vehicle and saw Slaughter and Johnson standing next to the car; Johnson was on the passenger side and Slaughter by its driver's side window. Ms. Bowens next saw several flashes emanating from inside the car and heard gunshots. She immediately began banging

on the door of the crack house begging to be let inside. While doing so, she heard another gunshot.

Ms. Bowens was eventually interviewed by the police but denied knowing anything about the incident. On September 8, 2005, however, Ms. Bowens agreed to a second interview after being advised by family members that she had to go to the authorities because her life was in danger. During the interview, Ms. Bowens implicated Johnson and Slaughter in the crime and identified photographs depicting the two men.

Just prior to the shooting, Ms. Williams was with a customer when she saw Ms. Bowens argue with a man in a car after which she walked up to Johnson and Slaughter and spoke to them for about a minute before walking away. The driver of the vehicle also left.

Shortly thereafter, Ms. Williams saw the car driven by the man who had been arguing with Ms. Bowens return. When it did so, Johnson and Slaughter, both of whom were carrying guns, ran up [to] the vehicle. Johnson went to the passenger side of the vehicle and Slaughter to the driver's side. Ms. Williams then heard the sound of gunfire coming from inside the car. When it stopped, both men fled.

Ms. Williams, like Ms. Bowens, initially told police that she had no information about the shooting. She, however, was interviewed a second time and identified Johnson and Slaughter as the individuals who shot Mr. Flomo.

In addition to Ms. Bowens and Ms. Williams, the Commonwealth called Slaughter to testify. Slaughter, who initially agreed to testify in exchange for a reduced sentence, refused to testify upon taking the witness stand. As a consequence, his statement, which he adopted during an in camera hearing, was read to the jury. In that statement, Slaughter stated that he and Johnson were selling drugs when Brenda Bowens walked up and complained about a guy in a green car. Soon thereafter, when the same car stopped nearby, Johnson ran up to the car and began shooting at the driver through the passenger window.

Other testimony included evidence that Johnson had ties to the area where the killing occurred and that following the killing, he and Slaughter abandoned the neighborhood.

.

Commonwealth v. Johnson, No. 3675 EDA 2009, at 2-4 (Pa. Super. Apr. 1, 2011) (quoting Commonwealth v. Johnson, No. CP-51-CR-1202272-2005, Opinion, at 1-4 (Phila. C.C.P. Feb. 5, 2010)). On August 6, 2009, Judge Minehart sentenced Johnson to consecutive prison terms of 20 -to- 40 years for murder and 10 -to- 20 years for conspiracy.

On December 17, 2009, Johnson filed a timely notice of appeal. In his brief to the Pennsylvania Superior Court, he identified the following issues: (1) whether his rights to a fair trial, confrontation of witnesses and exclusion of hearsay evidence were violated by his co-defendant's assertion of the Fifth Amendment before the jury and the introduction of his co-defendant's hearsay accusations; and (2) whether the trial court erred in permitting the Commonwealth to present evidence that implied that Johnson threatened a Commonwealth witness. Commonwealth v. Johnson, No. 3675 EDA 2009, Brief for Appellant, at 5 (attached as Exh. C to District Attorney's Response). On February 5, 2010, Judge Minehart issued an Opinion recommending affirmance, and on April 1, 2011, the Pennsylvania Superior Court affirmed. Commonwealth v. Johnson, No. CP-51-CR-1202272-2005, Opinion (Phila. C.C.P. Feb. 5, 2010); Commonwealth v. Johnson, No. 3675 EDA 2009, at 2-4 (Pa. Super. Apr. 1, 2011). Johnson's petition for allowance of appeal was denied by the Pennsylvania Supreme Court. Commonwealth v. Johnson, No. 405 EAL 2011 (May 16, 2012).[1]

On September 10, 2012, Johnson, through counsel, filed this petition for habeas corpus claiming (1) denial of due process by the prosecution's deliberate elicitation of his

[1] Johnson did not file a post-conviction petition in the state courts.

co-defendant's assertion of the Fifth Amendment before the jury, (2) denial of Sixth Amendment right to confrontation of witnesses, and (3) denial of due process by introduction of evidence falsely implying that Johnson threatened a witness. See Doc 1 ¶ 12 Grounds One-Three. Johnson also filed a memorandum of law in support of his petition. See Doc. 1 Mem.[2] On March 5, 2013, the District Attorney filed a response arguing that Johnson's claims are meritless and that a portion of his last claim is unexhausted. See Doc. 9. Johnson has filed a reply, and the case is now ripe for review. See Doc. 10.[3]

## II. LEGAL STANDARDS FOR MERITS REVIEW

### A. Deferential Review under AEDPA

The federal courts' habeas review is limited in nature. The Antiterrorism and Effective Death Penalty Act ("AEDPA"), which became effective on April 24, 1996, amended the standards for reviewing state court judgments in federal habeas petitions filed under 28 U.S.C. § 2254. Werts v. Vaughn, 228 F.3d 178, 195 (3d Cir. 2000). AEDPA increased the deference federal courts must give to the factual findings and legal determinations of the state courts. Id. at 196 (citing Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996)). Pursuant to 28 U.S.C. § 2254(d), as amended by AEDPA, a petition for

[2] In his memorandum of law in support of his petition, Johnson collapses the first two issues into a single argument heading. See Doc. 1 Mem. at 9. Because the two issues involve closely overlapping facts, I will address them together.

[3] Johnson's petition is timely filed. His conviction became final on August 14, 2012, when the time for filing a certiorari petition to the United States Supreme Court in his direct appeal expired. He filed his habeas petition less than one month later, on September 10, 2012.

habeas corpus may only be granted if (1) the state court's adjudication of the claim "resulted in a decision contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or if (2) the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). Factual issues determined by a state court are presumed to be correct, rebuttable only by clear and convincing evidence. Werts, 228 F.3d at 196 (citing 28 U.S.C. § 2254(e)(1)).

The Supreme Court has explained that "[u]nder the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). With respect to "the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The "unreasonable application" inquiry requires the habeas court to "ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409. As the Third Circuit has noted, "an unreasonable application of federal law is different from an incorrect application of such law and a federal habeas court may not grant relief unless that court determines that a state court's incorrect or erroneous

application of clearly established federal law was also unreasonable." Werts, 228 F.3d at 196 (citing Williams, 529 U.S. at 411).

**B. Harmless Error**

The finding of a constitutional error on habeas review does not require the granting of a habeas petition. Rather, before granting habeas relief, the court must conduct a harmless error analysis to determine if the constitutional violation had a "substantial and injurious effect" on the fairness of the trial. Fry v. Pliler, 551 U.S. 112, 121 (2007) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)). This requires the petitioner to establish that the constitutional error resulted in actual prejudice. Brecht, 507 U.S. at 637 (citing United States v. Lane, 474 U.S. 438, 449 (1986)). A finding of actual prejudice is appropriate when there is "grave doubt" about whether the error influenced the jury's decision, or where the evidence as to whether the constitutional error is harmless is in "virtual equipoise." See Bond v. Beard, 539 F.3d 256, 276 (3d Cir. 2008) (quoting O'Neal v. McAninch, 513 U.S. 432, 436 (1995)). "If, when all is said and done, the court's conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand." Adamson v. Cathel, 633 F.3d 248, 260 (3d Cir. 2011) (quoting O'Neal, 513 U.S. at 437-38). Unlike the determination of a constitutional violation, the harmless error analysis is performed de novo by the federal courts. Bond, 539 F.3d at 275-76 ("Fry instructs us to perform our own harmless error analysis under Brecht . . . , rather than review the state court's harmless error analysis under the AEDPA standard.") (citing Fry, 551 U.S. at 121).

## III. DISCUSSION

### A. Claims 1 & 2: Slaughter's Testimony and Statement

Johnson claims that two constitutional errors resulted from the Commonwealth's calling of Slaughter as a witness in his trial; a due process violation based on Slaughter's invocation of his Fifth Amendment right before the jury, and a Sixth Amendment confrontation violation based on admission of Slaughter's statement to police. Before addressing these claims, I will set forth the trial evidence and the circumstances of Slaughter's testimony in greater detail.

#### 1. Trial evidence

As previously noted, Slaughter was convicted of charges including third-degree murder in the first trial, and on November 29, 2007, Judge Minehart sentenced him to 25 to 50 years' imprisonment. Judge Minehart later vacated that sentence on the Commonwealth's motion based on Slaughter's agreement to testify in Johnson's retrial, and on September 5, 2008, Slaughter gave a statement to police naming Johnson as the shooter. In his opening statement to the jury, the prosecutor informed the jury that he would be calling Slaughter, that Slaughter was convicted at a prior trial, and that following his conviction he gave a statement. The prosecutor then told the jury, "[b]ut when you get up there is the moment of truth where you're going to tell the truth or you're going to punk out or be loyal to your friend." N.T. 5/28/09 at 31.

The Commonwealth's case began with the testimony of responding and investigating police officers who on August 26, 2005, found a man, later identified as off-duty Officer Flomo, in a Taurus automobile with some front-end damage that was resting

against a telephone pole at 20th and Turner Streets in Philadelphia. N.T. 5/28/09 at 44-45.[4] Medical evidence introduced during the trial established that he received three gunshot wounds to his arms and torso and died from the wound causing damage to his liver, heart and lungs. Id. at 152-55. Assuming that the victim was sitting in the driver's seat of the car, the medical examiner testified that the gunshots would have come from the passenger side of the car. Id. at 155-56, 162-63. A single spent bullet was recovered from the victim's body, identified as .38/.357 caliber, and a firearms expert testified that it was fired by a revolver. Id. at 155, 179-80. No weapon was recovered from the scene other than Officer Flomo's police-issued Glock as well as a single unspent .9mm shell that could have come from the officer's weapon. Id. at 46-47, 108, 179. There was no gunshot residue on Flomo's clothing, meaning that the gun had to be at least two and a-half-to-three feet away when fired. Id. at 163-64. There were two unburnt gunshot particles found on the passenger-side armrest, and there was testimony that a revolver can leave unspent gun powder but that it would not normally travel more than three feet and up to a maximum of five feet. Id. at 108-10, 178-79, 187-89. The only other physical evidence recovered was blood belonging to Flomo and fingerprints left by one of the investigating officers.[5] Id. at 112, 115. Witnesses described the area as involving significant drug and prostitution activity. Id. at 48-49. No witnesses immediately came

---

[4]There seems to be some discrepancy regarding the color of the car. Officer LaBrice referred to it as a light blue Ford Taurus, but the prosecutor repeatedly referred to it as a green car during questioning. See N.T. 5/28/09 at 44; 5/29/09 at 87.

[5]Two t-shirts were recovered in the area which could have matched a witness's clothing description but no physical or other evidence matched the shirts to Johnson or any other person. N.T. 5/28/09 at 123-25.

forward although certain descriptions were received of individuals seen leaving the scene or in the area. The only truly disputed issue was Johnson's identification as one of the assailants.

The evidence identifying Johnson came from three sources: Brenda Bowens, Nora Williams, and Slaughter.[6] Bowens was the first of these witnesses called, and she testified that, at the time of the incident, she was addicted to crack cocaine and worked as a prostitute to support her habit. N.T. 5/28/09 at 202-03. She would buy crack from Johnson, whom she knew as "Juice," and Slaughter, whom she knew as "Muk."[7] Id. at 204-05. That early morning she had just received money from a customer and used it to buy crack, and was on her way to buy cigarettes and a stem to smoke the crack. Id. at 205. A car stopped her, driven by a man she did not know who said "Hey, baby, what's up?" She said "the hell with you," because she wanted to get high, and as she crossed the street she saw Slaughter and Johnson and told them the man just tried to pick her up. Id. at 206-07. They did not say anything to her. She went to the store and made her purchase, and then cut through a lot to get back to 20th Street to enter a house to get high. Id. at 207-08. She glanced around to see if police were nearby, and saw Slaughter on the

---

[6]While there was some additional evidence that tended to corroborate Slaughter's presence on the street that early morning, no one else testified to Johnson's presence. David Kelly testified that about an hour before hearing shots he saw Slaughter drive past his house, and knew Slaughter to carry a gun. N.T. 6/1/09 at 89-90. A little while before hearing shots, Anthony Bennett saw Slaughter at 20th and Oxford Streets, shook his hand and gave him a hug and felt a bulge he previously testified he believed was a gun, and he also knew Slaughter to carry a gun. N.T. 6/2/09 at 6-10.

[7]Judge Minehart gave the jury a limiting instruction with respect to the evidence of Johnson's drug activity. N.T. 6/2/09 at 246-47.

driver's side and Johnson on the passenger side of the car that had just passed her, and she saw flashes and heard a gunshot and immediately ran and started banging on a door to be let in, and heard another shot and saw another flash. Id. at 208-11, 215-16. She did not report what she saw to police, and twice denied seeing anything when interviewed. Id. at 216-17. She testified that she made a statement on September 8, 2005, because her family was afraid she was in danger and someone might kill her. Id. at 217-18, 220. She also testified that she had to be relocated due to threats made after the preliminary hearing. Id. at 225. She testified that she violated the rules of her relocation numerous times, but ultimately got off drugs. Id. at 226-27. She also admitted prior convictions including weapons and drug offenses. Id. at 201-02. On cross examination she admitted that she only saw the incident for a "minisecond," and also that she could not be "really sure" of what she saw. N.T. 5/28/09 at 263; 5/29/09 at 22.

Nora Williams also testified that she worked as a prostitute to feed her crack habit, that she would buy crack from Juice and Muk on Turner Street, and that she was with a customer at about 2:00 that morning. N.T. 5/29/09 at 51-52. She testified that she heard a voice and saw "some girl named Brenda" arguing with "some guy," and saw Brenda walk away. Id. at 53. She then saw Brenda walk to Muk and Juice, and could see them talking at the corner of 20th and Cecil B. Moore Avenue, and did not see where Juice and Muk went when they separated. Id. at 54-55. After that she was going to get high with her customer, and she saw the car coming back on 20th Street. "That's when I seen Muk and Juice running towards the car. . . . I seen them both had guns. I heard the guns start just shooting, pop, pop." Id. at 58-59. From her vantage point facing the front of the car,

she saw that Muk was on the driver's side and Juice was on the passenger side.  Id. at 59.

They were close enough to touch the car.  She saw the two of them run back towards

Cecil B. Moore, and the car then drove past her and hit the pole at Turner.  Id. at 61-62.

She left the scene.  When police came looking for her, she denied seeing anything.  Id. at

64-65.  When they came a second time, she reported what she had seen, identified

photographs of the defendants, and signed a statement.  Id. at 65-66.  She testified that

she was relocated after "certain things" happened to her in the neighborhood.  Id. at 67.

On cross examination, she admitted that she had used crack that night, and that she had a

bench warrant on open cases at the time.  Id. at 77, 98.  She testified that she saw Brenda

get into the car and was in it for about five minutes including the argument.  Id. at 86-87.

She also admitted going back to using crack after her second interview.  Id. at 101-04.

Like Bowens, she also admitted that she only got a glance for a "minisecond" at the

individuals who came up to the car.  Id. at 113.

     Counsel and Judge Minehart then turned their attention to Slaughter, the

Commonwealth's next witness.  As previously noted, following his murder conviction

and sentence, Slaughter gave a statement implicating Johnson and his sentence was

vacated.  Outside the presence of the jury, the prosecutor reported that Slaughter, who

was in custody, was refusing to come up to the courtroom to testify despite a subpoena.

Judge Minehart and the prosecutor observed that Slaughter had no Fifth Amendment

right to refuse to testify.  N.T. 5/29/09 at 134-35.  This position is now acknowledged to

be incorrect.[8] Defense counsel did not note the error, nor did anyone else during the proceedings. Johnson was brought to the courtroom and was sworn, and the jury was brought in over defense counsel's request that Slaughter first be asked whether he would be testifying. Slaughter answered the prosecutor's initial questions, testifying that he was in jail having been convicted of murder and conspiracy and sentenced to 25 -to- 50 years' incarceration. Id. at 139-41. When asked if his lawyer filed a motion to vacate that sentence in an attempt to cooperate with the government, he said "no," and stated the prosecutor told him this information after "they brung me down like five or six times." Id. at 141. He denied making any statement, and when asked if he sold drugs in the period of time of August 26, 2005, the following exchange took place before the jury:

> THE WITNESS: Your Honor, I don't know why I'm sitting here. I don't have nothing to say.
> THE COURT: You've been called as a witness, Mr. Slaughter.
> THE WITNESS: Well, I did not witness anything.

---

[8]The Superior Court later ruled that the court and counsel "were operating under the mistaken belief that Slaughter had no Fifth Amendment privilege." Commonwealth v. Johnson, No. 3675 EDA 2009, at 10. Because Slaughter's original sentence had been vacated and he had not yet been sentenced, he still had a right under the Fifth Amendment to maintain his silence. See id. at 10 n.11 (citing Commonwealth v. Long, 625 A.2d 630, 631 (Pa. 1993)); see also Mitchell v. United States, 526 U.S. 314 (1999) (defendant did not waive privilege at sentencing by answering questions at guilty plea); Commonwealth v. Rodgers, 372 A.2d 771, 780 (Pa. 1977) ("The privilege against self-incrimination is 'accorded liberal construction in favor of the right it was intended to secure' and may be claimed when a witness 'has reasonable cause to apprehend danger' from answering questions put to him.") (citing Hoffman v. United States, 341 U.S. 479, 486 (1951). The District Attorney concedes the error. See Doc. 9 at 16-17. Ironically, in addressing Slaughter's invocation of his Fifth Amendment privilege in his closing argument, the prosecutor said:

> See, he thinks he knows the law. But he didn't go to the library long enough to know what we can do and what we can't do.

N.T. 6/2/09 at 220.

THE COURT: Well, you've been called as a witness because your sentence was vacated, and I was the sentencing judge who gave you 25 to 50 years. . . . And we're here now. And [the prosecutor] is going to ask you some questions.

THE WITNESS: I have nothing to say, Your Honor.

BY [THE PROSECUTOR]:

Q. Good. Well, listen to me a little while longer.

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: No. Overruled. It's not your -- you don't represent him.

BY [THE PROSECUTOR]:

Q. Sir, did you serve a federal sentence?

A. I plead the fifth. I don't have nothing to say.

THE COURT: You don't have a Fifth Amendment privilege.

THE WITNESS: Well, I'm just going to sit here with nothing to say, because you all can't force me to do anything.

[THE PROSECUTOR]: Your Honor, at this time I move to have this marked as Commonwealth Exhibit C-52.

. . . .

[DEFENSE COUNSEL]: Your Honor, I'm going to object to that.

THE COURT: He can be shown it. . . . Just take a look at it, Mr. Slaughter . . .

THE WITNESS: Judge Minehart --

THE COURT: Just -- you know, there will be time you can talk to me, Mr. Slaughter, but you have to take a look at that statement.

THE WITNESS: I'm looking at that right there.

. . . .

BY [THE PROSECUTOR]:

Q. . . . . I want you to look at the first page so you can read along with me, okay?

A. This feel kind of funny, 'cause you just told me -- I just told you that I'm not trying to come in here. And you told me I don't have to come in here, and so did other police officers and other lawyers. I didn't have to come in here. Now it's like you all forcing me to do so something that I don't want to do.

. . . .

THE COURT: I know you don't want to do it . . . . But as far as -- I don't know what happened as far as -- you were called as a witness, and that's why you were brought in here.

THE WITNESS: Well, no, I wasn't called as a witness. I was told that you had to tell me something due to the fact I didn't want to come in here. So now it's like something totally different is going on right now.

THE COURT: Well, I don't know that . . . .

BY [THE PROSECUTOR]:

Q.  Sir, a few minutes ago you spoke to me in the booth and then after I spoke to you, you spoke to [defense counsel], correct?

A.  Yeah.  You all both told me if I do not come in here, Mr. Minehart is going to hold me in contempt.

Q.  Sir, I told you at every point in time since the moment I spoke to you, that your lawyer let me speak to you, that you, once you made the statement, would have to come to court and testify.

A.  No. You told me --

Q.  Now, I'm not going to get into an argument with you.

[DEFENSE COUNSEL]:  May we see Your Honor?

THE COURT:  Let him finish.

. . . .

Q.  Listen to me, you spoke to that gentleman there, which is the defense attorney's investigator, a few days ago.

A.  Yes.

Q.  You had no problem talk to him.

A.  No, I didn't, cause --

Q.  Answer the question and then you can give a speech if you want.

[DEFENSE COUNSEL]:  Objection, Your Honor.

THE WITNESS:  I'm glad you pointed to him, because he's another person who told me I don't have to do anything I don't want to do.  Like right now you are forcing me, and it's like the judge is right with you forcing me to do something.

BY [THE PROSECUTOR]:

Q.  Look at that statement.  Is your name Mumin Slaughter?

A.  (No response.)

THE WITNESS:  Why am I sitting here --

[DEFENSE COUNSEL]:  Your Honor, perhaps I have a thought that --

THE WITNESS:  -- being forced to do something I don't want to do?

THE COURT:  All right.  Let me see you at sidebar.

N.T. 5/29/09 at 141-46.  Counsel and the court then discussed contacting Slaughter's attorney, and the trial broke for the weekend.

The following Monday morning, Slaughter's counsel was present and addressed Judge Minehart in his robing room.[9] His counsel reported that Slaughter acknowledged making the statement but was told that it would only be used to induce Johnson to plead guilty, that Slaughter was adamant that he did not want to testify and that he denied knowing who killed the officer. N.T. 6/1/09 at 4-7. The prosecutor proposed that Slaughter again be called to testify before the jury and that if he continued to refuse to testify he brought back before Judge Minehart to be resentenced, and that if he continued to refuse to answer following that proceeding he be held in contempt and be sentenced consecutively for each refusal. Id. at 9.

Slaughter was on the witness stand when the jury was brought out. When asked questions by the prosecutor, Slaughter refused to answer, and Judge Minehart overruled Johnson's counsel's objection to further questioning. N.T. 5/29/09 at 11-12. Slaughter admitted speaking a few moments earlier to the prosecutor and to his own lawyer, but otherwise had nothing to say. Id. at 13. After further questions, objections and refusals to answer, he refused to identify Johnson as his codefendant, and then stopped giving verbal responses to any of the prosecutor's questions. Id. at 15-16. The jury was again taken out, and Slaughter was advised that he was going to be resentenced and that he could be held in contempt for further refusal to testify. Id. at 17-18.

A separate proceeding was then held on Slaughter's case, and although it was referred to as a sentencing hearing, no sentencing took place. The same prosecutor and

[9] Slaughter's counsel did not object or correct Judge Minehart when the judge again instructed Slaughter that he did not have a Fifth Amendment right not to testify. N.T. 6/1/09 at 18.

Slaughter's counsel were present, as was Johnson's counsel. Judge Minehart again advised Slaughter that if he answered the prosecutor's questions the trial could proceed. N.T. 6/1/09 (Slaughter) at 5. Slaughter told the judge that "I put a freaking statement together to try to help myself, to make him not go to trial." Id. at 7. But now that Johnson was going to trial,

> [i]t's going to mess up the trial and make him look like a murderer. Nobody don't believe us anyway that we didn't do it. But being though I got 50 years, I wanted to help myself and make it back to my kids. Now he want me to sit here and say he did do this. I'm not willing to do that, because that's going to make me a liar and that's going to make me look bad, and I'm to have that on my conscience.

Id. When the prosecutor told him "You have now admitted that you did make a statement," he responded "My signature is here." He continued to avoid answering the question whether he made the statement, telling the judge he did not want to testify. "Just because I lost it don't mean he got to." Id. at 8. He asked to be sentenced for the case and for contempt and not be called back to testify. Id. at 9. He said he would refuse to cooperate with being brought back out and that he would remain mute. Id. at 10-11. The prosecutor then asked for sentence to be imposed higher than the sentence that was originally imposed, for a total of 30 to 60 years. Id. at 12.

As noted, Slaughter was not resentenced during the proceeding.[10] Following an off the record conference, the Johnson transcript resumed. N.T. 6/1/09 at 20.[11] In the

---

[10]Slaughter was sentenced on September 29, 2010, to 20 -to- 40 years' imprisonment. Commonwealth v. Slaughter, No. CP-51-CR-1202271-2005, Docket Sheet (Phila. C.C.P.).

judge's robing room, the prosecutor stated that if Slaughter refused to answer his questions he would go line by line though the statement. When asked if Slaughter stated on the record that he made the statement, the court reporter stated "Not exactly word for word as [the prosecutor] stated, but something to that effect, Your Honor." Id. at 21. Johnson's counsel objected, saying he would move for a mistrial because Slaughter's adoption of the statement was not fully explored and Slaughter was not taking the stand -- "you can't use that statement no matter what." Id. at 22. Judge Minehart reviewed Slaughter's testimony, observing "I don't recall exactly what his testimony was. I do remember that he admitted making a statement. And that . . . the statement was on the screen. And the exact words he used after that I don't recall. But that's an adoption of the statement." Id. at 23. Johnson's counsel objected on the ground that he did not have an opportunity to cross examine Slaughter, and the court deferred ruling, stating "let's see what he does." Id. at 23-24. Defense counsel pressed the issue, arguing "then if he doesn't answer any question, the right I have to confrontation of a witness has now been destroyed." Id. at 25. Judge Minehart denied the motion for mistrial with leave to renew. Id. at 26.

Before resuming the trial, defense counsel obtained a transcript of Slaughter's hearing and argued again that Slaughter had not adopted the statement. N.T. 6/1/09 at 28-31. Counsel argued that "if [Slaughter] takes the stand and he says 'I'm not going to say anything,' and you're going to put in the statement, I can't cross-examine him." The

[11] A portion of the proceedings appears in both the Johnson and the Slaughter transcripts. N.T. 6/1/09 at 20-27; N.T. 6/1/09 (Slaughter) at 14-21.

court said again deferred, waiting to see whether Slaughter would answer any questions. Id. at 31-34.

Slaughter once again appeared before the jury. N.T. 6/1/09 at 35. He did not respond to the prosecutor's first two questions, and when the prosecutor began to mark the statement, told the judge he would not answer anyone's questions. Id. at 36. The prosecutor moved the statement into evidence, and defense counsel objected and renewed his mistrial motion which the court denied. Still before the jury, Slaughter said he was supposed to be getting sentenced for contempt and that no one could force him. Id. Over both Slaughter's and defense counsel's protests, the court permitted the prosecutor to display Slaughter's statement on a screen to the jury. Id. at 37-38. When asked if it was the statement he made, Slaughter denied it and was clearly very upset, accusing the prosecutor of being "a liar. He's a sneak. . . . He threaten people." Id. at 38-39. The court then stated that he would grant defense counsel's request for a sidebar, but the prosecutor continued to ask Slaughter to identify the signature as his and in a heated exchange Slaughter refused to respond to the question. Id. at 39-41. The court then refused defense counsel's request for a sidebar and allowed the prosecutor to confront Slaughter with his testimony from the separate hearing. The prosecutor asked Slaughter if he recalled stating, "So I put a freaking statement together to try to help myself, to make him not go to trial," and Slaughter stated he remembered saying that. Id. at 42-43. Slaughter then stated as follows to the jury:

> Listen, I got found guilty for a fucking murder that nobody don't know who killed this man. They gave me 50 years and nobody said I did nothing. They trying to railroad

> us. They gave me 50 years. My own lawyer, even him told me I can never get back in court to get back to my kids or nothing. They said just say that you all did it and he won't want to go to trial. You can get your 50 years back and he'll take a statement – I mean, he'll take a deal. He won't want to go nowhere, because he be scared if I come out there with all these other liars saying that we did something.
>
> I didn't have no choice. I didn't know what to do. I was scared. A desperate man do desperate things. I tried it. Now, he didn't go for it. He didn't take it because he know me. He know that I was lying. He knew that I wouldn't do this, because it was a lie.

Id. at 43-44.

The jury was led out soon thereafter, although the prosecutor continued trying to ask Slaughter questions. After the jury was out, focusing on the issue of cross examination, Judge Minehart asked Slaughter if he would answer defense counsel's questions, which Slaughter managed to avoid answering despite the judge's and defense counsel's attempts to clarify. Id. at 46-50. The jury was again brought in. Defense counsel established through initial leading questions that Slaughter would refuse to answer his questions, and moved for a mistrial. Id. at 51-52. The court suggested that defense counsel was waiving his cross examination. Counsel then asked a series of questions with no response from the witness other than that Slaughter acknowledged that he could hear and asked why he was still in court. Id. at 52-54. The prosecutor asked whether Slaughter acknowledged that he previously identified his signature on the statement, and there was no response from Slaughter after the court overruled defense counsel's objection to the question. Slaughter was then taken out of the courtroom. Id. at 54-55.

At sidebar on the issue of whether there was cross examination, the two attorneys debated whether and for what reason the witness answered questions, the prosecutor blaming defense counsel for "brilliantly telegraph[ing]" to the witness that he should not answer the prosecutor's questions and defense counsel protesting that there was nothing to ask the witness given how he responded to the prosecutor's questions.  Id at 56-57. The court then overruled defense counsel's Sixth Amendment objection and mistrial motion:

> [G]iven all we've seen in this case, given the fact that . . . the witness . . . is trying to subvert justice by his total lack of cooperation, and from the fact that the initial questions he's not going to answer, and then the other questions were really questions [from defense counsel] . . . of no substance . . . I don't see it as a violation of the Sixth Amendment in that he answered some questions.  But it's clear from the behavior of this witness that he is in conjunction with the defendant, although the defendant may not be part of it.  There's no indication of that.  He is trying to subvert justice, and for that I am not going to permit it – for that I'm going to let the detective testify and the statement. . . .  [M]y ruling is based further on the testimony elicited during the sentencing of Mr. Slaughter in which Mr. Slaughter admitted to making a statement.  Albeit he said he was making up lies, admitted to signing the statement, and, in fact, in the view of this Court, adopted the statement.  And as such, his refusal to say anything was just another effort by Mr. Slaughter to subvert justice in this matter.

Id. at 57-60.

Upon resumption of the trial, the prosecutor called the detective who took the statement, who read the entire statement in question-answer format.  N.T. 6/1/09 at 66-70.  The statement includes the following information: Slaughter was known by the nickname "Muk;" he had spoken with his attorney who told him he should cooperate; on

the night in question he and Juice were selling crack on the corner of 20th and C. B. Moore when Brenda came up and was upset and told Juice that a guy in a car tried to pick her up for sex; the car she pointed to then pulled up heading north on 20th Street and stopped at the light at Cecil B. Moore; Juice pulled out his gun and started firing at the guy through the passenger side[12] and then they both ran in different directions; he had not seen Juice since that time; he learned the next day in the news that the man was a police officer and had died; he did not know Juice had a gun; he thought Juice shot the man because he was bothering Brenda who was a regular customer of theirs; and Juice was locked up and his second trial was coming up.

On cross examination, the detective stated that Slaughter was reluctant "to the point where he cried" and spent many hours in the District Attorney's office before giving the statement. N.T. 6/1/09 at 73-74. The detective was aware of the investigation into Officer Flomo's death prior to taking Slaughter's statement. Id. at 78-79.

Just before resting, the prosecutor called the court reporter to read into evidence the transcript of the hearing that took place outside the jury's presence when Slaughter was asked about the statement, and defense counsel renewed his objection. N.T. 6/2/09 at 75. Slaughter's testimony, summarized above, supra at 16-17, was then read to the jury including the statements of counsel and the court. N.T. 6/2/09 at 76-85.

[12] The detective testified that he at first wrote that Slaughter said Juice was on the driver's side but that Slaughter corrected it to put passenger side. N.T. 6/1/09 at 70.

Following a brief defense, the trial concluded.[13] The court did not give the jury any special instructions with respect to Slaughter's testimony or statement.

2. Introduction to Applicable law

Johnson raises both due process and Sixth Amendment challenges to the prosecution's presentation of Slaughter as a witness and the admission of his statement to police. First, he argues he was denied a fair trial when the trial court permitted the prosecutor to repeatedly call Slaughter to testify when the prosecutor knew Slaughter would invoke his Fifth Amendment right not to testify. Second, he argues that admission of Slaughter's statement without the ability for cross examination violated Johnson's right to confront the witnesses against him. Johnson's arguments begin with Namet v. United States, 373 U.S. 179 (1963).

In Namet, a case arising in a direct appeal, the Supreme Court reviewed several lower court decisions addressing the propriety of a prosecutor calling a witness with knowledge that the witness would invoke his testimonial privilege. The Court observed that the decisions focused on two factors.

> First, some courts have indicated that error may be based upon a concept of prosecutorial misconduct, when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege. . . . A second theory seems to rest upon the

[13] The defense read into the evidence the prior testimony of a witness, Debra Bryant, who had given a statement in which she said she saw two men known as Peanut and Jeff shoot into the car, and on cross examination she denied seeing anything. N.T. 6/2/09 at 107, 114. The defense also played an audiotape with a stipulation that inmate conversations are recorded with the knowledge of the inmates. N.T. 6/2/09 at 129-30. The tape was not transcribed and is not contained in the state-court record. Neither side has raised any issue concerning the relevance of this tape.

> conclusion that, in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant.

Namet, 373 U.S. at 186-87. Thus, one approach asks if there was prosecutorial misconduct in calling the witness, and the other approach asks if there was a due process violation based on the advantage the prosecution gained when the witness refused to testify and could not be cross-examined. In Namet, the Court did not find it necessary to address the propriety of either of these approaches, finding instead that the record did not support any inference of prosecutorial misconduct and that the few invocations of the Fifth Amendment privilege did not constitute reversible error. Id. at 188-89.

The second of the two approaches discussed by the Court in Namet, focusing on the opportunity for cross-examination, seemed to foreshadow the Court's decision in Crawford v. Washington, in which the Court held that testimonial out-of-court statements are not admissible under the Confrontation Clause unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the witness. 541 U.S. 36, 68 (2004).

Here, Johnson relies on Namet to challenge the propriety of the prosecutor's calling Slaughter to testify when he knew Slaughter would invoke his Fifth Amendment privilege against self-incrimination, Doc. 1 at 27-28, and on Crawford to challenge the admission of Slaughter's post-trial statement to the police. Doc. 1 at 32.

3. Analysis

a. Prosecutorial Misconduct

In addressing the prosecutorial misconduct aspect of Johnson's claim challenging Slaughter's testimony, the Superior Court relied on the mistaken belief shared by the court and all counsel -- that Slaughter did not have a Fifth Amendment privilege at the time of Johnson's trial -- to conclude that the prosecutor had not engaged in misconduct.

> [T]o the extent Johnson argues "a prosecutor may not call to the stand a witness whom the prosecutor knows or has reason to know will invoke his Fifth Amendment rights," see Johnson's [direct appellate] Brief at 16, we note that both parties and the trial court were operating under the mistaken belief that Slaughter had no Fifth Amendment privilege. Additionally, at Slaughter's sentencing hearing on June 1, 2009, no argument was made by Slaughter's counsel that he could or would assert his Fifth Amendment right. We conclude this was not an improper attempt by the Commonwealth to create an inference of guilt by association between Johnson and Slaughter. Accordingly, Johnson's first argument is meritless.

Commonwealth v. Slaughter, No. 3675 EDA 2009, at 11-2 (Pa. Super. Apr. 1, 2011).

I first note that Johnson's assertion that "the prosecutor and the court knew that [Slaughter] . . . would claim a Fifth Amendment privilege," Doc. 1 at 28, is somewhat overstated. As previously noted, in his opening statement, the prosecutor told the jury that Slaughter had given a statement but that when he was called to testify was "the moment of truth where you're going to tell the truth or you're going to punk out or be loyal to your friend." N.T. 5/28/09 at 31. Then, when it was time for Slaughter to be called, the following transpired on the record without the jury present:

[PROSECUTOR]:  I've been alerted by your court crier that my next witness is Mr. Mumin Slaughter.  He's in custody and has refused to come up to testify.

THE COURT:  He's subpoenaed?

[PROSECUTOR]:  He is subpoenaed.  He's a state prisoner.  He has to come up here.

THE COURT:  Right.

[PROSECUTOR]:  What I'm asking for is that he be shackled, put in a wheelchair, if we have to, and if he has to wheel him to that witness stand to testify.  He cannot just say, "I am not coming up to the room."

THE COURT:  Well, he has no Fifth Amendment privilege.

[PROSECUTOR]:  Absolutely not.

THE COURT:  Of course, I'll hear you [defense counsel], but you don't represent him.

[DEFENSE COUNSEL]:  That's correct.  But I think the only thing you can do with him is hold him in contempt, because you can't do anything more than if he decides he doesn't want to appear in court.

. . .

THE COURT:  Well --

[PROSECUTOR]:  Well, Your Honor, I would ask this then -- because I did speak to him yesterday, and he was having a conversation with me, and he knew he was going to testify and was ready, willing and able.  I have no idea what occurred downstairs.  Once he's brought up here, I would ask to see him in the booth.

THE COURT:  That's fine.  We'll order him up.  We'll issue an order.  Bring him upstairs.  You'll put him in the booth.  You can speak to him.  He's your witness.  We'll go from there.

[DEFENSE COUNSEL]:  May I speak to him after he's through?  I have a right.

[PROSECUTOR]:  That's, of course, if he wishes to.

[DEFENSE COUNSEL]:  Of course, if he wishes to.  I have never spoken to this guy.

THE COURT:  Okay, very well.

. . .

[DEFENSE COUNSEL]:  The other thing, Your Honor, is since we're on the record, that I would ask the Court to make inquiry of this witness as to whether or not he wants to testify and if he wants to even be in the courtroom.

> [THE COURT]: Well, he's a subpoenaed witness, and, you know, he's subpoenaed here. He's brought in by the Commonwealth. If he doesn't testify, we will take the jury out and we'll deal with it at that time.
>
> [DEFENSE COUNSEL]: Okay, Your Honor.

N.T. 5/29/09 at 135-38.

In context, it does not appear that the prosecutor had advance knowledge of Slaughter's intention to invoke his Fifth Amendment rights. The prosecutor clearly knew that Slaughter had misgivings about testifying, but it is not clear that he knew Slaughter would refuse to testify on Fifth Amendment grounds. Apart from the court's own reference to the Fifth Amendment in the above exchange, the first mention of the Fifth Amendment in the record is when Slaughter stated "I plead the fifth" when called to testify before the jury. N.T. 5/29/09 at 142. Moreover, like the prosecutor in Namet, in this case, the prosecutor, along with the court, defense counsel, and Slaughter's counsel, had the mistaken belief that the witness did not have a Fifth Amendment right to assert, and questioning of the witness continued.

Johnson also argues that "[t]he only pertinent question is whether the prosecutor had any reason to believe that the witness would invoke the privilege," Doc. 1 at 30. However, in Namet, the Court found no misconduct when the prosecutor called witnesses whose attorney had advised the prosecutor that the witnesses would be invoking the Fifth Amendment privilege. Namet counsels that "the prosecutor need not accept at face value every asserted claim of privilege, no matter how frivolous." 373 U.S. 179, 188. Johnson's reliance on Namet to sustain his prosecutorial misconduct argument does not support him on this point.

Moreover, here the prosecutor did not attempt "to build [his] case out of inferences arising from use of the testimonial privilege." Namet, 373 U.S. at 187. Rather, the prosecutor attempted to build his case by introducing Slaughter's prior statement, the propriety of which will be discussed in the next section of this report. See infra at 28-29. Under the circumstances, the Superior Court's determination that the prosecutor's decision to call Slaughter "was not an improper attempt . . . to create an inference of guilt by association," Commonwealth v. Slaughter, No. 3675 EDA 2009, Opinion at 12 (Pa. Super. Apr. 1, 2011), was not contrary to the Supreme Court's discussion in Namet.[14]

b. Due Process/Confrontation Clause

The second theory discussed in Namet for addressing a claim based on the prosecutor's calling a witness who invokes his testimonial privilege is based on the Due Process Clause and encompasses the Confrontation Clause issue presented in Johnson's second habeas claim. See Doc. 1 ¶12 GROUND TWO & 32-40. Basically, Johnson claims that the introduction of and repeated questioning regarding the statement Slaughter allegedly made to the police after his trial violated Johnson's rights to confrontation because Slaughter refused to answer nearly every question posed to him by defense counsel.

[14]Considering that this portion of Namet was merely dicta involving the hypothetical application of the lower courts' analyses, even a violation of this aspect of Namet would not require habeas relief. See 28 U.S.C. § 2254 (d) (writ can be granted if decision violative of clearly established federal law as established by the United States Supreme Court).

When the Superior Court considered this claim on direct appeal, it found that Slaughter's statement constituted inadmissible hearsay and its introduction violated Johnson's rights under the Confrontation Clause. Commonwealth v. Johnson, No. 3675 EDA 2009, at 6 (Pa. Super. Apr. 1, 2011). However, the court concluded that the error was harmless in light of the other evidence presented at trial.

I agree with the Superior Court's conclusion that there was a confrontation violation in Johnson's case. At trial, Slaughter refused to respond to questions regarding the statement he gave to police which implicated Johnson. N.T. 6/1/09 at 35-51. What the prosecutor could not get in directly from Slaughter, he succeeded in admitting through Detective John McDermott, who read into the record every question and response in the statement, including Slaughter's statement that "Juice pulled out his gun and started firing at the guy through the passenger side." Id. at 68. At the conclusion of the evidence, the court permitted the court reporter to read the transcript of Slaughter's sentencing hearing to the jury.[15] N.T. 6/2/09 at 76-85.

Admission of Slaughter's post-trial statement implicating Johnson was clearly a violation of Johnson's Confrontation Clause rights under Crawford. A police interrogation is testimonial. Crawford, 541 U.S. at 53. At Johnson's trial, Slaughter

[15]As previously mentioned, when Slaughter first took the stand and refused to testify, the court recessed and convened a hearing to sentence Slaughter. During that hearing, Slaughter was not sentenced, but was confronted with his purported statement. Slaughter stated, "I put a freaking statement together to try to help myself, to make [Johnson] not go to trial." N.T. 6/1/09 (Slaughter) at 7. He also identified his signature on the statement. Id. at 8. At one point during that proceeding, the prosecutor accused Slaughter of "undermin[ing] the truth-seeking process" by refusing to testify. N.T. 6/1/09 (Slaughter) at 12; read to jury N.T. 6/2/09 at 84.

properly invoked his Fifth Amendment rights, rendering him unavailable to testify. See Bourjaily v. United States, 483 U.S. 171, 182 (1987) (invocation of Fifth Amendment rights renders witness unavailable). Johnson never had an opportunity to cross-examine Slaughter regarding the statement because Slaughter refused to answer questions regarding the statement at Johnson's trial.[16] Thus, the Superior Court correctly determined that admission of Slaughter's statement violated Johnson's confrontation rights.

c. Harmless Error

Finding a Confrontation Clause violation does not end the inquiry. Before granting habeas relief, the court must determine if the constitutional violation had a

[16]To the extent the District Attorney suggests that Slaughter's statements during his own hearing that were read by the prosecutor at Johnson's trial somehow constituted a fair opportunity for cross-examination, see Doc. 9 at 18, I reject the argument. Similarly, to the extent the District Attorney is arguing that cross-examination would have been irrelevant, as Johnson suggests, see Doc. 10 at 7, I reject the argument. At Slaughter's so-called sentencing hearing, he denied the veracity of the statement, claiming that he was only trying to help himself. N.T. 6/1/ 09 (Slaughter) at 6-7. The prosecutor read this portion of that hearing into evidence in Johnson's trial, and at the conclusion of the evidence in Johnson's trial, the court reporter read the entirety of Slaughter's sentencing hearing into the record. N.T. 6/1/09 at 42-43; 6/2/09 at 76-85. After reviewing all the testimony, Slaughter's simple disavowal of the veracity of the statement is not a substitute to fair cross-examination. See United States v. McGlory, 968 F.2d 309, 344 (3d Cir. 1992) (quoting Delaware v. Fensterer, 474 U.S. 15, 19 (1985) (court must ensure that invocation of the Fifth Amendment did not "effectively . . . emasculate the right of cross-examination"); see also Mattox v. United States, 156 U.S. 237, 242-43 (1895) ("The primary object of the [Confrontation Clause] . . . was to prevent depositions or ex parte affidavits . . . being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." ).

"substantial and injurious effect" on the fairness of the trial.  Fry, 551 U.S. at 121

(quoting Brecht, 507 U.S. at 637).  As previously discussed, supra at 7, the harmless error

analysis is performed de novo by the federal courts.  Bond, 539 F.3d at 275-76.  In

performing this analysis, the Supreme Court has stated that a reviewing court should

consider the importance of the witness's testimony, whether the testimony was

cumulative, the presence or absence of evidence corroborating or contradicting the

testimony of the witness on material points, the extent of cross examination permitted,

and the overall strength of the prosecution's case.  Delaware v. Van Arsdall, 475 U.S.

673, 684 (1986).

    The Superior Court found the error harmless, concluding that "Slaughter's

statement was merely cumulative of the testimony provided by Bowens and Williams."

Commonwealth v. Johnson, No. 3675 EDA 2009, at 11 (Pa. Super. Apr. 1, 2011).  In

coming to this conclusion, the court relied only on the properly admitted testimony from

Bowens and Williams, and the supporting evidence presented by Dr. Lieberman, the

medical examiner.  Id. at 7-11.  Although the federal courts do not owe deference to the

state court's harmless error conclusion, I agree that the evidence against Johnson was

strong enough, even apart from the evidence admitted in violation of Crawford, that the

error did not cause actual prejudice.

    As previously discussed, Ms. Bowens and Ms. Williams were both working as

prostitutes in the area of 20th and Cecil B. Moore.  They had both known Slaughter and

Johnson for several years and frequently purchased drugs from them.  N.T. 5/28/09 at

204; 5/29/09 at 52-53.  Ms. Bowens testified that she had been approached by the man in

the green car and propositioned.  N.T. 5/28/09 at 206.  She mentioned this to Johnson and Slaughter as she headed to the store to get cigarettes and supplies for smoking crack.  Id. at 205-07.  Upon her return, she saw Slaughter and Johnson leaning on the decedent's vehicle -- Slaughter at the driver's side and Johnson at the passenger side.  Id. at 208-09.  She saw sparks and heard gunshots.  Id. at 208-10, 266.  Likewise, Ms. Williams testified that she saw Ms. Bowens arguing with a man in a car that night and then Ms. Bowens walked toward Slaughter and Johnson.   N.T. 5/29/09 at 54-56.  When the car came back around the block, Ms. Williams saw Slaughter and Johnson run toward the car.  Id. at 58.  Slaughter was on the driver side and Johnson on the passenger.  Id. at 59.  Both had guns out and she heard the shooting.  Id. at 59, 61.

Ms. Bowens' and Ms. Williams' accounts of the shooting are consistent with the testimony of Dr. Lieberman, the medical examiner, who testified that the victim suffered three gunshot wounds.  N.T. 5/28/09 at 154-55.  Two of the wounds were to his right arm, and the third and "more immediately fatal" of the shots was to his right chest.  Id. at 155.  Dr. Lieberman explained that based on the injuries, the bullets came from the front passenger side of the car, approximately 2½ -to- 3 feet away from the victim.  Id. at 162-64.  The evidence that two unburnt gunshot particles found on the passenger-side armrest would have fallen between three and five feet from the weapon was also consistent with the witness testimony.  Id. at 108-09, 187.

Petitioner complains about the Superior Court's analysis of the evidence for a litany of reasons including its failure to focus on the prejudicial effect of this type of

Bruton violation,[17] the length of time that the prosecution focused on Slaughter's statement and testimony during Johnson's trial, the prosecutor's use of the evidence in closing, and the fact that the eyewitnesses had been highly impeached. See Docs. 1 at 33-37 & 10 at 7-8.

I have carefully reviewed the testimony in Johnson's case. I am cognizant of the time the prosecutor focused on Slaughter, some of which occurred while the jury was outside the courtroom, and the prosecutor's reliance on Slaughter's statement. Although Johnson argues that Ms. Williams and Ms. Bowers were "highly" impeached, the similarity in their testimony lends them credence, as does the corroborating medical and forensic evidence. The fact that each had a long-term relationship with Johnson and Slaughter also lends credibility to their identifications.

In his memorandum, Petitioner seems to suggest that admission of his co-defendant's statement cannot be deemed harmless error. See Doc. 1 at 16 ("[T]he . . . Supreme Court has ruled that the use of a co-defendant's admission that contains accusations against a defendant is so prejudicial that even a cautionary instruction is insufficient to cleanse the prejudice.").[18] Contrary to this assertion, even a Bruton

---

[17]Bruton refers to the Supreme Court's decision in Bruton v. United States, 391 U.S. 123, 135 (1968), in which the Court determined that use of a co-defendant's admissions which contained accusations against the defendant violated the Confrontation Clause and required the sterilization of the statement for its admission.

[18]Johnson relies on several cases in which Confrontation Clause violations were not found to be harmless. However, in each case there was little or weak evidence implicating the petitioner/defendant other than the erroneously admitted evidence. In Jones v. Basinger, 635 F.3d 1030 (7th Cir. 2011), the court noted that the only evidence other than that found inadmissible implicating Jones was that of another accomplice

violation requires the court to find that the error was not harmless in order to grant relief.

See, e.g., Bond, 539 F.3d at 276 (Bruton error harmless on habeas review where

eyewitness identified defendant, another witness gave statement identifying defendant as

shooter which she recanted at trial, and defendant admitted the shooting but argued

confession was coerced); Johnson v. Folino, 735 F. Supp.2d 225, 244 (E.D. Pa. 2010)

(Bruton error harmless based on eyewitness accounts corroborated by other evidence);

---

whose veracity was greatly impeached by an extraordinarily favorable plea deal.  Id. at
1054.  In Wood v. Ercole, 644 F.3d 83, 94-96 (2d Cir. 2011), the court noted that, absent
the inadmissible videotape of the defendant's statement to police after invoking his right
to counsel, the prosecution's case rested on two witnesses -- "a cooperating gunman and
a disgruntled ex-girlfriend" -- who were heavily impeached and had a motive to testify.
In Bobadilla v. Carlson, 575 F.3d 785, 793 (8th Cir. 2009), a sexual abuse case, the trial
court's admission of the child-victim's interview in violation of Crawford was not
harmless where the only other evidence was the victim's mother's testimony recounting
the victim's statement identifying the defendant and a doctor's testimony that the medical
examination was consistent with sexual abuse.  In Jenson v. Romanowski, 590 F.3d 373,
379-81 (6th Cir. 2009), involving sexual assault of a minor, the trial court erred under
Crawford by admitting an officer's interview of a previous sexual assault victim
identifying the defendant, and the error was not harmless because the prosecutor relied
heavily on similarities between the past and current assaults and the defendant admitted
the fact but none of the details of the prior assault.  Despite Johnson's insistence that the
eyewitnesses in this case were heavily impeached, as will be discussed later in this
Report, I find the similarity in their testimony and its consistency with the medical and
forensic evidence lends it credibility.

 After briefing, Johnson's counsel submitted a letter relying on the Third Circuit's
recent opinion in Washington v. Pennsylvania Dept. of Corr., 726 F.3d 471 (3d Cir.
2013).  In Washington, the evidence showed that the defendant was the driver of the
getaway car, and the trial court erroneously admitted a non-testifying co-defendant's
statement redacted to implicate "the driver" in violation of Bruton.  The court concluded
that the error was not harmless where the only other evidence to support the conviction
was the testimony of a co-conspirator whose impeachment included drug and alcohol
abuse, an incentive to distort the story to his benefit, and repeated lying to police during
questioning and in earlier judicial proceedings.  Id. at 481-82.  Such is not the case here.
Two women, who did not seem friendly with one another from the testimony, described
the circumstances of the incident nearly identically.  Despite their admitted drug
problems, their testimony did not suffer the type of impeachment as occurred in
Washington.

Sanders v. Klem, 341 Fed. Appx. 839, 843 (3d Cir. 2009) (Bruton error harmless on

habeas review where defendant's own statements and medical examiner's testimony that

shooting was at close range established that shooting occurred during robbery rather than

during flight); Robinson v. Shannon, Civ. No. 08-1074, 2009 WL 2474632, at *6 (E.D.

Pa. Aug. 11, 2009) (Bruton error harmless on habeas review where defendant confessed

and a witness described defendant's role in plan); see also United States v. Hardwick, 544

F.3d 565, 574 (3d Cir. 2008) (Bruton error harmless beyond a reasonable doubt on direct

appeal where several witnesses including co-conspirators testified to defendants'

participation in murders, another witness described escalating dispute between defendant

and one of victims, and shell casings from one murder scene matched those at another

murder scene); United States v. Ruff, 717 F.2d 855, 858 (3d Cir. 1983) (Bruton error

harmless on direct review where defendant admitted crimes to witness, did not deny

crimes when codefendant admitted them to another witness, and defendant drove victim's

car and had her personal effects; cf. Vazquez v. Wilson, 550 F.3d 270, 282-83 (3d Cir.

2008) (Bruton error not harmless on habeas review where defendant did not confess to

shooting victim and no witness testified that he fired a weapon); Holland v. Attorney

General of New Jersey, 777 F.2d 150, 157-59 (3d Cir. 1985) (Bruton error not harmless

on habeas review where defendant did not admit crime and no eyewitness placed

defendant at scene at the time of crime).

     Johnson relies on Adamson v. Cathel, 633 F.3d 248 (3d Cir. 2011), in arguing that

the Confrontation Clause violation in this case was not harmless.  Doc. 1 at 37-38.  In

Adamson, however, the only evidence against the petitioner was his own confession,

which he claimed was fabricated, and the improperly admitted accomplice statements implicating the petitioner in the robbery.  633 F.3d at 260-61.  The court specifically noted that there was no eyewitness testimony and no physical evidence linking the petitioner to the robbery.  Id. at 261.  In Johnson's case we have the testimony of two eyewitnesses who knew him for several years, and who identified him as the person on the passenger side of the car firing the gun, and their testimony is corroborated by the physical evidence that the shots were fired from the passenger side of the car.

Finally, Johnson argues that the hung jury in the first trial established that the Confrontation Clause violation was not harmless.  "At the second trial, where the only difference in the Commonwealth's case was the inadmissible evidence, the jury returned a verdict of guilt[y]."  Docs. 1 at 37 &10 at 11-12.[19]  The District Attorney responds that "it is sheer speculation to claim that the admission of Slaughter's statement would have caused that jury to convict."  Doc. 9 at 30.

Although the prior hung jury is one factor that must be considered in determining whether the admission of Slaughter's statement was harmless, it is not determinative. The Second Circuit, in addressing the admission of an un-Mirandized statement, found that the admission was harmless despite the fact that the defendant's first trial ended in a hung jury.

---

[19]I also note that defense witness Debra Bryant did not appear at the second trial. Her testimony from the first trial was read into the record by counsel.  Her testimony was comprised of a statement she gave to police on September 5, 2005, identifying two men named "Peanut" and "Jeff" as the men who shot the decedent.  Neither was Slaughter or Johnson.

> A jury may hang for any number of reasons, including the idiosyncratic views of a single juror. Thus, while a prior hung jury may support a finding that an error committed with respect to a very close issue during a retrial is not harmless, . . . it does not compel such a conclusion.

United States v. Newton, 369 F.3d 659, 680 (2d Cir. 2004); see also United States v. Williams, 212 F.3d 1305, 1311 n.10 (D.C. Cir. 2000) ("We advise caution in assigning critical significance to the failure of a different jury, which heard different evidence and argument, to reach agreement."). After independently reviewing the evidence, I find that the admission of Slaughter's statement was harmless in light of all the evidence.

It may be that some doubt remains whether the jury would have convicted Johnson without hearing Slaughter's inculpatory statements. However, in light of the Commonwealth's evidence, apart from Slaughter's statement, I cannot say that such doubt is "grave." Rather, having reviewed the entire trial transcript and the transcript of the prior trial, I conclude that Johnson has failed to show that the Confrontation Clause/Crawford violation had a "substantial and injurious effect" on the fairness of his trial.

### C. Claim 3: Evidence that Witness Was Threatened

In his final claim, Johnson argues that he was denied due process when the prosecutor falsely suggested that Johnson had threatened a witness. See Doc. 1 at 41-42. The District Attorney argues that Johnson never presented this claim to the state courts as one implicating due process, but rather raised it only as a state evidentiary issue. See Doc. 4 at 32-33. Reviewing Johnson's appellate brief, I agree that the claim was presented as one of state evidentiary law, but nevertheless conclude that, construed as a

due process violation, it does not warrant relief. See 28 U.S.C. § 2254(b)(2) (application for habeas corpus may be denied notwithstanding failure to exhaust).[20]

A state court evidentiary error is cognizable in habeas only if it rises to the level of a due process violation.

> An evidentiary error in a state trial justifies federal habeas corpus relief only if the error is "so extreme that it constitutes a denial of fundamental fairness under the due process clause. Furthermore, the challenged evidence must be a crucial, critical, or highly significant factor in the context of the entire trial."

Brooks v. Zimmerman, 712 F. Supp. 496, 501 (W.D. Pa. 1989) (quoting Bridge v. Lynaugh, 838 F.2d 770, 772 (5th Cir. 1988) (citing Bisaccia v. Attorney General, 623 F.2d 307 (3d Cir. 1980)).

During her direct examination, in explaining why she did not come forward earlier or identify Slaughter and Johnson the first time she was questioned, Ms. Bowens explained that her family told her to go to the police for her own safety. "My family was calling all around. They was like people's going to kill you. You need --" (at which point there was an objection). N.T. 5/28/09 at 217-18. In a sidebar conference that followed, the prosecutor explained that Ms. Bowens was not stating that Johnson had threatened her. The court allowed the questioning to continue with the proviso that any safety issue was not going to be connected to Johnson. Id. at 218-19. Ms. Bowens then continued that "my family was real concerned that I was in danger, someone was going to

[20]Because the state courts did not have an opportunity to address the claim as one alleging a violation of due process, I will employ de novo review of the claim. See Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001) (when state court has not reached merits of claim, de novo review applies).

kill me and that I needed some help." Id. at 220. The Superior Court found that the Commonwealth's "anticipatory bolstering" was improper.

> Here, the prosecutor did not wait to see if defense counsel would elicit Bowens' prior statements on cross-examination. The court allowed Bowens to explain on direct examination before making a recantation as to why she did not initially come forward and give a statement to police. This anticipatory bolstering was, therefore, improper.

Commonwealth v. Johnson, No. 3675 EDA 2009, at 13-14 (Pa. Super. Apr. 1, 2011). Despite finding an error, the court went on to find that the admission of this evidence was harmless error.

In the context of the trial, Ms. Bowens' statement did not infect the trial with unfairness. Johnson argues that Ms. Bowens' statement "directly implicated [him] in criminal conduct." See Doc. 1 at 41. This is inaccurate. In explaining the reason for her differing statements, she did not name Johnson as making any threats. Although the jury may have inferred that Johnson was somehow involved in the threats, there were other reasons Ms. Bowens may have been fearful for her safety. The jury had learned that she was a drug addict and prostitute at the time. She had testified that Johnson and Slaughter regularly sold drugs at the corner of 20th and Cecil B Moore. If she implicated the neighborhood drug dealers in this crime, the drug users who relied on Slaughter and Johnson might do her harm, which would provide a basis for her family's fears. This was also corroborated by Ms. Bowens' testimony that she "was threatened by numerous people." N.T. 5/28/09 at 224.

Johnson argues that the error in admitting Ms. Bowens' statement regarding threats was compounded by the prosecutor's assertion before the jury that he had preserved Bowens' testimony in case she died before trial. See Doc. 1 at 41 (citing N.T. 5/29/09 at 28-29). Although I see no conceivable relevance to this testimony, there was no evidence linking Johnson with the threats. Thus, the prosecutor's elicitation of this statement did not deny Johnson fundamental fairness.

## IV. CONCLUSION

Johnson's three claims do not warrant habeas relief. To the extent Johnson challenges the prosecution's decision to call Slaughter, allegedly knowing that he would invoke his Fifth Amendment right, the claim is meritless. The prosecutor did not seek to bolster his case by virtue of Slaughter's invocation. Although Johnson has established that the admission of Slaughter's statement violated his rights under the Confrontation Clause, I find that such error was harmless. Finally, Ms. Bowens' statement regarding threats and the Commonwealth's preservation of her testimony did not jeopardize the fundamental fairness of Johnson's trial.

Therefore, I make the following:

**RECOMMENDATION**

AND NOW, this 18th day of December 2013, IT IS RESPECTFULLY RECOMMENDED that the petition for writ of habeas corpus be denied. There has been no substantial showing of the denial of a constitutional right requiring the issuance of a certificate of appealability. Petitioner may file objections to this Report and Recommendation. See Local Civ. Rule 72.1. Failure to file timely objections may constitute a waiver of any appellate rights.

/s/ELIZABETH T. HEY

ELIZABETH T. HEY
UNITED STATES MAGISTRATE JUDGE